**SMITH MULLIN, P.C.**
Neil Mullin, Esq.
420 Lexington Avenue, Suite 300
New York, New York 10170
(212) 297-6134
nmullin@smithmullin.com
Attorneys for Plaintiff

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FAYE BOATRIGHT,<br><br>      Plaintiff<br><br>v.<br><br>U.S. BANCORP., U.S. BANK NATIONAL ASSOCIATION and U.S. BANCORP. INVESTMENTS, INC., jointly, severally and in the alternative,<br><br>      Defendants. | Civil Action No. |

Plaintiff, Faye Boatright, residing at 9 Belleview Street, Weehawken, New Jersey 07086, by way of Complaint says:

### NATURE OF THIS ACTION

1.      This is an action brought to remedy discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 ("Title VII"), the Equal Pay Act, 29 U.S.C. § 206(d)("the Equal Pay Act") , the New York State Human Rights Law, Executive Law § 292(21)(c) ("the Human Rights Law") and the New York City Human Rights Law, New York City Administrative Code § 8-107, *et seq.* ("the City Human Rights Law").

1

## PARTIES

2.      Plaintiff Faye Boatright ("Plaintiff" or "Ms. Boatright") was an employee of Defendant U.S. Bancorp.

3.      Plaintiff is an African-American female.

4.      Defendant U.S. Bancorp. ("Defendant" or "the Defendant bank" or "the bank") is a bank holding company based in Minneapolis, Minnesota. It is the parent company of U.S. Bank National Association, known as U.S. Bank, which is ranked 5th on the list of largest banks in the United States. The company provides banking, investment, mortgage, trust, and payment services products to individuals, businesses, governmental entities, and other financial institutions. The company has 3,106 branches and 4,842 ATMs, primarily in the Midwestern United States.

5.      As stated above, at all times relevant hereto, Defendant U.S. Bank National Association was a subsidiary of U.S. Bancorp. and was also the Plaintiff's employer as reflected on the Plaintiff's written offer letter.

6.      At all times relevant hereto, Defendant U.S. Bancorp. Investments, Inc. was an entity affiliated with U.S. Bancorp. and was the entity whose name appeared on the Plaintiff's paychecks and tax documents.  As such, Defendant U.S. Bancorp. Investments, Inc. was also the Plaintiff's employer.

7.      At all times relevant hereto, Plaintiff worked at the Defendant bank's New York City office located at 461 5th Ave, New York, NY 10017.

## JURISDICTION

8.      The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that the matter involves citizens of different states and exceeds $75,000.00, exclusive of interest and costs.

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that the matter involves a federal question, arising under Title VII and the Equal Pay Act.

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1367, in that the Court can exercise pendent jurisdiction over the Plaintiff's claims arising under the New York State Human Rights Law and the New York City Human Rights Law.

11.     On or about October 19, 2015, Plaintiff timely filed a Charge of Discrimination with the EEOC.  In her EEOC Charge, Ms. Boatright asserted that after she was hired on February 13, 2012, she was subjected to disparate pay in violation of the above cited statutes based on her gender and race.

12.     After extensive investigation, on May 18, 2018, the EEOC issued a finding of Probable Cause, in which it concluded that the Defendants U.S. Bancorp. – U.S. Bank National Association had subjected Ms. Boatright to discrimination in pay based on her race and sex.

13.     This Complaint is being timely filed with 90 days of the issuance of the EEOC's finding of Probable Cause.

## VENUE

14.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to the Plaintiff's claims occurred within the Southern District of New York.

## FACTS

15.     Ms. Boatright has over 25 years of investment banking experience spanning both the municipal and corporate bond markets. During her career, Ms. Boatright has served as the lead banker on numerous transactions for large issuers from the East Coast through the Midwest, including: states, major cities, as well as state and local authorities. Ms. Boatright has covered the spectrum of municipal infrastructure credit structures, with particular expertise in special tax bonds as well as the transportation and water and sewer sectors. Within the variable rate market, in addition to standard product alternatives, she has served as senior banker for large taxable extendible and floating rate note transactions. Ms. Boatright's investment banking experience includes senior positions at Goldman, Sachs & Co. and Morgan Stanley.

16.     Prior to being hired by Defendants, Ms. Boatright served as the Chief Operating Officer of BondFactor, a newly formed municipal bond insurance company.

17.     Ms. Boatright obtained her BA in Public Policy from Stanford University and received an MBA from The Wharton School of Business at the University of Pennsylvania, with a concentration in Finance.

18.     On February 13, 2012, U.S. Bancorp. hired Plaintiff as the Managing Director to head its Northeast Region within the Municipal Securities Group ("MSG") with the targeted purpose to generate new business for the bank.

19.     At all times relevant hereto, the Defendant bank's Northeast Region generated approximately 25% of the volume of municipal new issue bond transactions every year; equal to or greater than the bank's West Coast volume.

20.     In her capacity as Managing Director, Ms. Boatright also covered the Defendant bank's Midwest Region, and, at the end of 2012, the Defendant bank hired a banker to cover the Midwest Region.

21.     At all times relevant hereto, the Defendant bank employed bankers in the following positions: Managing Director ("MD"), Director, Vice President, President, Assistant Vice President, Associate, Analyst and Administrative Assistant.  All of the job titles are in rank order, with the MD being the highest job title among them.  Plaintiff, as well as the other MDs, were all supported by all of the above-referenced job titles and the employees who held those positions were referred to as "resources" or as a "team."

22.     During Plaintiff's tenure with the Defendant bank, the bank discriminated against Plaintiff based on her race and gender.

23.     During Plaintiff's tenure with the Defendant bank, it employed Scott Nagelson, a white male, as a Managing Director.  Just as Plaintiff was the Managing Director for the Northeast and Midwest Regions, Mr. Nagelson was the Managing Director for the Defendant bank's West Coast Region.

24.     Mr. Nagelson was hired only months before Plaintiff, and was assigned resources, including a large team to support him.

25.     Unlike in the case of Mr. Nagelson, when the Defendant hired Plaintiff, Defendant did not assign her a team to support and assist her.  Instead, the Defendant bank gave Plaintiff limited resources, assigning her only one (1) Associate, Elizabeth Conte, who also supported four other Directors (a level below Plaintiff's Managing Director position).

26.     The four aforesaid Directors that Ms. Conte supported, all of whom were subordinate to Plaintiff and none of whom was African-American, also, like Mr. Nagelson, had

more support than the Plaintiff. The Defendant provided those four Directors with Associates and/or Analysts to support their function, while Plaintiff, the only African-American Managing Director, was only provided with a fraction of their support.

27.     Thus, although Plaintiff was assigned the heaviest volume public finance geographical area (the Northeast), the Defendant bank denied her the resources of a professional support team. In addition, during her tenure with the Defendant bank, the limited resources which were assigned to the Plaintiff did not report to her and/or were not accountable to her while the other Managing Directors, specifically Mr. Nagelson, and Directors had resources reporting directly to them and accountable to them.

28.     During Plaintiff's tenure with the Defendant bank, the bank discriminated against her by, among other things, allocating her client relationships and deals to other, non-minority employees. For example, in 2012, Managing Director Scott Verch, a white male, was assigned credit for a groundbreaking interest rate swap with New York City which Plaintiff had sourced and for which she should have received credit. In 2014, Managing Director Timothy Schlegelmilch, a white male, specifically instructed Lorenzo Boyd, a financial advisor at Stifel Nicolaus, not to call Plaintiff about a business opportunity with the St. Louis School District, an area Plaintiff had covered for 20 years where the Plaintiff had long-standing relationships.

29.     In 2014 and 2015, the Defendant bank assigned another Managing Director, Scott Allison, a white male, an account and credit for a transaction with the Long Island Power Authority, even though the Defendant bank knew that Plaintiff had developed the business with the Long Island Power Authority, by cultivating a relationship with the Authority's CFO, Tom Falcone, whom Mr. Allison had never met.

30.     In 2015, another Managing Director (who was not African-American and was male) was assigned credit for a $150 million dollar transaction with the Metropolitan Transportation Authority ("MTA"), even though the Defendant bank knew that Plaintiff had covered the MTA for 3 years and had done extensive work on the Request for Proposal, meeting presentations and follow up work.  The Managing Director who was assigned the MTA account had done no work building the client relationship.

31.     Plaintiff objected to what she reasonably believed to be discriminatory employment practices to the Defendant bank's upper management, including the following: Steven "Alex" Wallace (a white male), the Head of Public Finance; Richard Kolman (a white male), the Head of the bank's Municipal Securities Group; Joseph F. Murphy (a white male), the Head of the bank's Public and Non-Profit Division; Richard Payne (a white male), Vice Chairman and Head of Wholesale Banking; and Maureen McGovern (a white female), Human Resources.

32.     Rather than take prompt and effective remedial action to end the discrimination against Plaintiff, the Defendant bank increased and intensified its discriminatory behavior, and, in many cases, such as with the Long Island Power Authority and the MTA, the Defendant bank's upper management was directly involved in the discriminatory behavior.

33.     Upon information and belief, during Plaintiff's tenure with the Defendant bank, it discriminated against Plaintiff by paying her at a rate less than the rate at which it paid Mr. Nagelson and other white male Managing Directors for equal work on jobs the performance of which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

34.     At the time Plaintiff was hired, the Defendant bank paid her a lower starting salary/compensation than Mr. Nagelson, the West Coast Region's Managing Director.

35.     In addition, in April 2015 the Defendant bank promoted Mr. Nagelson, claiming that he was promoted because he had greater resources than Plaintiff.  However, it was the Defendant bank that granted Mr. Nagelson, a white male, those greater resources while denying those same resources to the Plaintiff, an African-American female.

36.     This disparate pay continued until Plaintiff was terminated on January 12, 2016. Had the Plaintiff not been unlawfully terminated and properly compensated during her tenure, the Plaintiff would have continued to be employed and received a much larger total compensation package than she did while she was employed at the Defendant bank.

37.     From 2012 to 2014, the Defendant bank did not give Plaintiff any performance goals or written evaluations.  When Plaintiff was hired, she asked Steven Wallace (a white male), the Head of Public Finance, what her revenue target was.  Mr. Wallace told Plaintiff that she had no specific target and that the Defendant bank only wanted to see evidence that Plaintiff had helped the bank grow its Municipal Bond business.

38. During Plaintiff's tenure with the Defendant bank, she met or exceeded the Defendant bank's expectations.  For example, in 2012, Plaintiff won a mandate for an interest rate swap from New York City that generated substantial revenue.  This transaction was the Municipal Securities Group's first interest rate swap with a governmental client.  This transaction was also one of the most significant pieces of business generated within the entire Department.

39.     Despite her excellent performance, the Defendant bank continued to pay the Plaintiff less than other white male Managing Directors for equal work on jobs the performance

of which required equal skill, effort, and responsibility, and which were performed under similar working conditions.

40.     In or about December, 2014 at the Defendant bank's holiday party, Plaintiff complained to Dick Payne, the bank's Vice Chairman that she was being discriminated against on the basis of her race and sex.  Mr. Payne, a member of the Defendant bank's upper management, did nothing to stop the discrimination aimed at the Plaintiff.

41.     After the holiday party, Plaintiff complained both verbally and in writing to Maureen Sullivan in the Human Resources Department.  Subsequently, Ms. Sullivan contacted Plaintiff and advised her that she [Ms. Sullivan] had allegedly investigated Plaintiff's complaints of discrimination and concluded that they had no merit.  In truth, Plaintiff's claims were substantial and meritorious.

42.     Rather than end the discrimination aimed at Plaintiff, in February, 2015, the Defendant bank retaliated against the Plaintiff by issuing her a written performance evaluation for the first time in her tenure.  In this written evaluation, the Defendant bank falsely criticized her performance.  Plaintiff refused to sign the evaluation and submitted a written response.  The Defendant bank never responded to her rebuttal.

43.     Thereafter, the Defendant bank continued to retaliate against the Plaintiff by falsely criticizing her performance and issued her two additional written reviews in which the bank baselessly criticized her performance.

44.     Contrary to the Defendant Bank's allegations that Plaintiff was a poor performer, during her tenure with the Defendant bank Plaintiff outperformed her male peers.  Based largely on her relationships and banking skills, Plaintiff generated ground breaking transactions, including, among others: the first governmental interest rate swap; the largest commercial paper

transaction; an unrated real estate loan; senior managed transactions and pre-determined economics deals.

45.     Plaintiff secured over $30 billion in volume of fixed rate bond transactions from issuers with which the Defendant bank had not previously done business, including New York City, the Commonwealth of Massachusetts, States of Connecticut, New Jersey and New York along with state authorities and municipalities, including: Metropolitan Washington Airports Authority; District of Columbia Water and Sewer Authority; New Jersey Turnpike Authority and the cities of St. Louis and Jacksonville. The volume and profitability of the Plaintiff's transactions was comparable to or exceeded that of Mr. Nagelson's West Coast team.

46.     Plaintiff's work was widely complimented in writing by both internal colleagues and external clients and financial advisors. At the time of her termination, Ms. Boatright already had two transactions lined up for 2016, including a pre-determined economics deal for District of Columbia Water and Sewer Authority, for which the Defendant Bank continued to obtain revenue after her termination.

47.     The Defendant bank retaliated against the Plaintiff in other ways, such as excluding her from business calls, emails, meetings and industry conferences, all of which detrimentally impacted the Plaintiff's ability to effectively perform her job duties.  For example, the Defendant bank refused to permit Plaintiff, one of the two senior women in Public Finance, from attending the Women in Public Finance Conference.  Instead, the Defendant bank sent, among others, a white male Director, Paul Chatalas to the conference.

48.     In April 2015, the Defendant bank retaliated against Plaintiff by demoting her and making her report to Mr. Nagelson, who had no experience covering the East Coast Region.  At

this same time, the Defendant bank promoted her white male comparator, Mr. Nagelson.  Mr. Nagelson became the Plaintiff's supervisor.

49.     In July, 2015, Mr. Nagelson retaliated against Plaintiff by giving her a negative performance evaluation.  The evaluation was rife with false accusations that Plaintiff was performing poorly and failed to cite any examples of Plaintiff's actual positive job performance.

50.     After his promotion, Mr. Nagelson announced to the entire Department and others that that the name of the Plaintiff's subgroup would be the National Infrastructure Group ("NIG") after joking that he had ruled out naming the Plaintiff's subgroup the Public Infrastructure Group because the acronym for that title was "PIG."  Thus, Mr. Nagelson instead chose a title which had the racist and offensive acronym "NIG," obviously short for n***er. This caused Plaintiff terrible embarrassment and humiliation.  Despite the fact that members of the Defendant bank's upper management were in attendance when Mr. Nagelson made this announcement, none took any action or addressed his discriminatory and racist conduct.

51.     On October 19, 2015, Plaintiff timely filed an EEOC Charge asserting that she had been discriminated against and retaliated against by the Defendant bank on the basis of her race and gender.

52.     U.S. Bancorp. responded to Plaintiff's EEOC Charge.  It is noteworthy that in its response to Ms. Boatright's EEOC charge, the Defendants admitted that Ms. Boatright made an internal complaint of discrimination *before* the Defendant bank retaliated against her by falsely criticizing her performance:

> *Before Ms. Boatright was formally reviewed*, she approached another employee at the company's holiday party and stated that she felt that she was being discriminated against. (Emphasis Supplied.)

53.     The "employee" to whom Ms. Boatright complained at the holiday party was not just some mere co-worker – it was Dick Payne, the Defendant bank's Vice Chairman.  Thus, as set forth more fully herein, Mr. Payne and other members of the Defendant bank's upper management, such as Rick Kolman, Steven "Alex" Wallace, their boss, Joseph Murphy, Head of Public and Non-Profit Banking, and Jennie Carlson, Head of Human Resources, actually participated in the discriminatory and retaliatory conduct, or were fully aware of Ms. Boatright's complaints and disparate treatment and did nothing to stop it or help her.

54.     Only months later, on January 12, 2016, the Defendant bank retaliated against Plaintiff by terminating her employment.

55.     Thereafter, the Defendant bank further retaliated against the Plaintiff by issuing her a "dirty" U5 form, falsely stating that plaintiff had been terminated by the bank for "unsatisfactory job performance."  Thus, the Defendant bank has destroyed Plaintiff's ability to obtain another job in the field of public finance, and effectively ended her over 25 year career in public finance.

## COUNT ONE

### (Discrimination in Violation of Title VII)

56.     Plaintiff repeats the facts set forth in Paragraphs 1-55 as if fully set forth at length herein.

57.     42 U.S.C. § 2000e–2, states, in pertinent part:

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, . . . sex, . . . ; or

58.     Plaintiff is a member of a protected class based on her race, African-American, and gender, female. Plaintiff was paid less than similarly-situated workers who are not members of those protected classes. Based on the aforementioned facts, circumstances surrounding the pay disparity suggests that the Defendants engaged in intentional discrimination.

59.     As a result, Defendants are liable to Plaintiff under Title VII.

60.     As a direct and proximate result of the Defendants' discrimination, Plaintiff has suffered and continues to suffer compensatory damages, including lost wages, reputational damages, emotional distress damages, and personal physical injury and sickness.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a)     Economic damages, such as back pay and front pay;

(b)     Compensatory damages, including damages for personal physical injury and sickness and emotional distress;

(c)     Attorneys' fees and costs of suit;

(d)     Punitive damages; and

(e)     Such other relief as the Court may deem equitable and just.

## COUNT TWO

### (Retaliation in Violation of Title VII)

61.     Plaintiff repeats the facts set forth in Paragraphs 1-60 as if fully set forth at length herein.

62.     42 U.S.C. § 2000e–3(a), states, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . , . . . to discriminate against any individual, . . ., because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

63.     Defendants retaliated against Plaintiff in violation of Title VII by among other things, falsely criticizing her performance, terminating her employment, and issuing her a "dirty" U5 after her termination.

64.     As a result, Defendants are liable to Plaintiff under Title VII.

65.     As a direct and proximate result of the Defendants' retaliation, Plaintiff has suffered and continues to suffer compensatory damages, including lost wages, reputational damages, emotional distress damages, and personal physical injury and sickness.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a)     Economic damages, such as back pay and front pay;

(b)     Compensatory damages, including damages for personal physical injury and sickness and emotional distress;

(c)     Attorneys' fees and costs of suit;

(d)     Punitive damages; and

(e)     Such other relief as the Court may deem equitable and just.

## COUNT THREE

### (Discrimination in Violation of the Equal Pay Act)

66.     Plaintiff repeats the facts set forth in Paragraphs 1-65 as if fully set forth at length herein.

67.     29 U.S.C. § 206(d)(1) states, in pertinent part:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, . . .

68.     At all times relevant hereto, the Defendants: (1) paid different wages to persons of the opposite sex; (2) the employees performed equal work in positions requiring equal skill, effort and responsibility; and (3) the jobs were performed under similar working conditions.

69.     Defendants discriminated against Plaintiff in violation of the Equal Pay Act by paying different wages to Plaintiff and her male comparators.  Plaintiff and her male comparators performed equal work in positions requiring equal skill, effort and responsibility.  Plaintiff's job and the jobs of her male comparators were performed under similar working conditions.

70.     As a result, Defendants are liable to Plaintiff under the Equal Pay Act.

71.     As a direct and proximate result of the Defendants' discrimination, Plaintiff has suffered and continues to suffer compensatory damages, including lost wages, reputational damages, emotional distress damages, and personal physical injury and sickness.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

    (a)    Economic damages, such as back pay and front pay;

    (b)    Compensatory damages, including damages for personal physical injury and sickness and emotional distress;

    (c)    Attorneys' fees and costs of suit;

    (d)    Punitive damages; and

    (e)    Such other relief as the Court may deem equitable and just.

## COUNT FOUR

### (Discrimination in Violation of the New York State Human Rights Law)

72.    Plaintiff repeats the facts set forth in Paragraphs 1-71 as if fully set forth at length herein.

73.    McKinney's Executive Law § 296(1)(a) states, in pertinent part:

It shall be an unlawful discriminatory practice:

(a) For an employer . . . , because of an individual's . . . race, . . . color, national origin, . . . sex, . . ., to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

74.    Plaintiff is a member of a protected class based on her race, African-American, and gender, female.  Plaintiff was paid less than similarly-situated workers who are not members of those protected classes.  Based on the aforementioned facts, circumstances surrounding the pay disparity suggests that the Defendants engaged in intentional discrimination.

75.    As a result, Defendants are liable to Plaintiff under the New York Human Rights Law.

76.     As a direct and proximate result of the Defendants' discrimination, Plaintiff has suffered and continues to suffer compensatory damages, including lost wages, reputational damages, emotional distress damages, and personal physical injury and sickness.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a)     Economic damages, such as back pay and front pay;

(b)     Compensatory damages, including damages for personal physical injury and sickness and emotional distress;

(c)     Attorneys' fees and costs of suit;

(d)     Punitive damages; and

(e)     Such other relief as the Court may deem equitable and just.

## COUNT FIVE

### (Retaliation in Violation of the New York Human Rights Law)

77.     Plaintiff repeats the facts set forth in Paragraphs 1-76 as if fully set forth at length herein.

78.     McKinney's Executive Law § 296(1)(e) states, in pertinent part:

For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

79.     Defendants retaliated against Plaintiff in violation of the New York Human Rights Law by among other things, falsely criticizing her performance, terminating her employment, and issuing her a "dirty" U5 after her termination.

80.     As a result, Defendants are liable to Plaintiff under the New York Human Rights Law.

81.     As a direct and proximate result of the Defendants' retaliation, Plaintiff has suffered and continues to suffer compensatory damages, including lost wages, reputational damages, emotional distress damages, and personal physical injury and sickness.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a)     Economic damages, such as back pay and front pay;

(b)     Compensatory damages, including damages for personal physical injury and sickness and emotional distress;

(c)     Attorneys' fees and costs of suit;

(d)     Punitive damages; and

(e)     Such other relief as the Court may deem equitable and just.

## COUNT SIX

**(Discrimination in Violation of the New York City Human Rights Law)**

82.     Plaintiff repeats the facts set forth in Paragraphs 1-81 as if fully set forth at length herein.

83.     New York City Administrative Code § 8-107(1)(a)(3) states, in pertinent part:

It shall be an unlawful discriminatory practice:

(a) For an employer or an employee or agent thereof, because of the actual or perceived . . . race, . . . color, national origin, gender, . . . of any person:

(3) To discriminate against such person in compensation or in terms, conditions or privileges of employment.

84.     Defendants discriminated against Plaintiff under the New York City Human Rights Law by treating her less well than other employees because of her race and gender.

85.     As a result, Defendants are liable to Plaintiff under the New York City Human Rights Law.

86.     As a direct and proximate result of the Defendants' discrimination, Plaintiff has suffered and continues to suffer compensatory damages, including lost wages, reputational damages, emotional distress damages, and personal physical injury and sickness.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a)     Economic damages, such as back pay and front pay;

(b)     Compensatory damages, including damages for personal physical injury and sickness and emotional distress;

(c)     Attorneys' fees and costs of suit;

(d)     Punitive damages; and

(e)     Such other relief as the Court may deem equitable and just.

## COUNT SEVEN

### (Retaliation in Violation of the New York City Human Rights Law)

87.     Plaintiff repeats the facts set forth in Paragraphs 1-86 as if fully set forth at length herein.

88.     New York City Administrative Code § 8-107(7) states, in pertinent part:

It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter. The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.

89.     Plaintiff engaged in a protected activity as that term is defined under the New York City Human Rights Law.  The Defendants were aware that she participated in such protected activity.  The Defendants engaged in conduct which was reasonably likely to deter a person from engaging in such protected activity.  There is a causal connection between the Plaintiff's protected activity and the Defendants' retaliatory conduct.

90.     Defendants retaliated against Plaintiff in violation of the New York City Human Rights Law by among other things, falsely criticizing her performance, terminating her employment, and issuing her a "dirty" U5 after her termination.

91.     As a result, Defendants are liable to Plaintiff under the New York City Human Rights Law.

92.     As a direct and proximate result of the Defendants' retaliation, Plaintiff has suffered and continues to suffer compensatory damages, including lost wages, reputational damages, emotional distress damages, and personal physical injury and sickness.

**WHEREFORE**, cause having been shown, Plaintiff demands judgment against Defendants, jointly and severally, and seeks the following relief:

(a)   Economic damages, such as back pay and front pay;

(b)   Compensatory damages, including damages for personal physical injury and sickness and emotional distress;

(c)   Attorneys' fees and costs of suit;

(d)   Punitive damages; and

(e)   Such other relief as the Court may deem equitable and just.

**SMITH MULLIN, P.C.**

Attorneys for Plaintiff

BY: _____
NEIL MULLIN

Dated: August 13, 2018

**JURY DEMAND**

Plaintiff demands trial by jury with respect to all issues that are so triable.

**SMITH MULLIN, P.C.**

Attorneys for Plaintiff

BY: _____
NEIL MULLIN

Dated: August 13, 2018