UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
:
FAYE BOATRIGHT,                                                         :
:
                                        Plaintiff,                     :
:
                       -v-                                             :
:
U.S. BANCORP, U.S. BANK NATIONAL                                       :
ASSOCIATION, and U.S. BANCORP INVESTMENTS,                             :
INC.                                                                   :
:
                                        Defendants.                    :
:
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_12/16/2020_

18-cv-7293 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff Faye Boatright ("Plaintiff" or "Boatright") brings this action under Title VII of

the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, *et seq.* ("Title VII"), and the Equal

Pay Act, 29 U.S.C. § 206(d) (the "EPA"). Plaintiff additionally brings state law claims under the

New York State Human Rights Law, N.Y. Exec. L. § 292(21)(c) (the "NYSHRL"), and the New

York City Human Rights Law, N.Y.C. Admin. Code § 8-107, *et seq.* (the "NYCHRL"). Plaintiff

alleges that her employers, U.S. Bancorp, U.S. Bank National Association, and U.S. Bancorp

Investments, Inc. ("Defendants" or "U.S. Bank"), discriminated against her on the basis of her

race and gender by paying her less than similarly situated colleagues and unlawfully retaliated

against her for filing a charge of discrimination with the Equal Employment Opportunity

Commission (the "EEOC"). Defendants moves for summary judgment on all claims. For the

reasons that follow, Defendants' motion is granted and all claims are dismissed.

**BACKGROUND**

The following facts are drawn from Defendant's 56.1 statement and are supported by

specific citations to record evidence and are either assented to or responded to by Plaintiff with objections that do not contain citations to admissible evidence.  Except where otherwise noted, the facts are undisputed for purposes of this motion.  *See Stewart v. Fashion Inst. of Tech.*, 2020 WL 6712267, at *1 (S.D.N.Y. Nov. 16, 2020) (citing *Cruz v. Wyckoff Heights Med. Ctr.*, 2016 WL 4533568, at *1 (S.D.N.Y. July 19, 2016)).

A.  U.S. Bank's Infrastructure Group

Defendants are affiliated diversified financial services companies with headquarters in Minneapolis, Minnesota.  Dkt. No. 86 ¶¶ 5, 7.  U.S. Bank's traditional "footprint" is in the Midwest and West Coast of the United States.  *Id.* ¶ 8.  U.S. Bank maintains no retail branches on the East Coast.  *Id.* ¶ 10.

In 2010, U.S. Bank decided to establish the Municipal Securities Group ("MSG"), based in Charlotte and New York.  *Id.* ¶ 11; Dkt. No. 77-6 at 11-12.  It hired Rick Kolman ("Kolman") to be head of the MSG.  Though Kolman was based in U.S. Bank's office in New York City, his task was to develop the group nationwide.  *Id.* ¶ 13.  *Id.*

In the same year, U.S. Bank also decided to create the Public Finance Group ("PFG") as a subgroup of the MSG.  *Id.* ¶ 12.  PFG's business was considered a "start-up" business within U.S. Bank.  *Id.* ¶ 15.  Its business was to generate revenue through various financial instruments including the underwriting and selling of bonds on behalf of municipalities that were seeking to raise money for infrastructure projects, as well as providing other means of liquidity for such projects.  *Id.* ¶ 12.  Steven "Alex" Wallace ("Wallace"), based in Charlotte, North Carolina, was assigned to serve as head of the PFG and to report to Kolman.  *Id.* ¶ 14.

B.  Hiring of Nagelson

In 2010, Kolman and Wallace decided to build out the PFG on the West Coast.  The West

Coast was a traditionally important region for U.S. Bank.  *Id.* ¶ 16; Dkt. No. 77-6 at 13.  Kolman and Wallace began plans to open an office in San Francisco.  Dkt. No. 77-6 at 15.  As one of their first steps in building the business, they decided to hire a senior banker to develop the PFG's West Coast business and to build and lead the PFG's new office in San Francisco. Kolman and Wallace agreed that the candidate would need to serve as a supervisory principal for the San Francisco office.  Dkt. No. 86 ¶ 21.  A supervisory principal must hold a Series 53 license from the Financial Industry Regulatory Authority ("FINRA"), which qualifies an individual to oversee a bank's municipal securities activities and supervise and train principals and representatives.  *Id.*  Kolman and Wallace identified Scott Nagelson ("Nagelson") as the most desirable candidate for the position.  *Id.* ¶¶ 17, 22.

In the fall of 2010, Wallace approached Nagelson at a conference to ask him whether he might be interested in building and leading the San Francisco office.  *Id.* ¶ 23.  His responsibilities would include opening the office, hiring bankers and support staff, and performing senior public finance banking work.  *Id.* ¶ 18.  At the time, Nagelson had twenty-two years of experience in public finance, thirty years of total banking experience, and eight years of experience working in a commercial bank.  *Id.* ¶ 24.  He had previously established a San Francisco Public Finance Office for Merrill Lynch and Co.  *Id.* ¶ 28.  At the time he was identified as a potential candidate, Nagelson was employed at Jefferies & Co. ("Jefferies") as a Managing Director in charge of its public finance group in San Francisco.  *Id.* ¶ 26.  Nagelson's job at Jefferies was " . . . [to] call on clients . . . throughout California, and develop underwriting opportunities with that [sic] those relationships."  *Id.* ¶ 27.

Kolman and Wallace actively recruited Nagelson over a period of more than six months. *Id.* ¶ 29.  As part of the hiring process, Nagelson negotiated with U.S. Bank for a compensation

package. *Id.* ¶ 30. Nagelson advised U.S. Bank that he stood to leave a significant amount of money behind by leaving Jefferies, including a $66,666 forgivable loan, a $10,000 bonus advance, unvested restricted stock grants and a 401(k) match. *Id.* ¶ 31. To induce Nagelson to leave Jefferies, U.S. Bank offered him a signing bonus and guaranteed incentive compensation for his first year of employment. *Id.* ¶ 32.

U.S. Bank made Nagelson a formal employment offer on June 6, 2011. *Id.* ¶ 34. The offer letter indicated that Nagelson would be employed with the title "Public Finance, Managing Director" with an internal job grade of 18. *Id.* ¶ 35. The offer included: (1) a base salary of $225,000; (2) a $100,000 signing bonus; and (3) a $435,000 guaranteed incentive compensation payment comprised of cash and stock grants for his first year of employment. *Id.* ¶ 36. After the first year, his incentive compensation would be subject to the terms of U.S. Bank's Capital Markets/Municipal Securities Group Incentive Plan (the "Incentive Plan"), which provided incentives based on employees' performance in three areas: (1) revenue performance; (2) business development, including cross-selling of the MSG's products and services; and (3) subjective components including "fostering collaboration among peers," "sharing credit for team successes," and "contribut[ing] to the training of junior professionals." *Id.* ¶¶ 37, 82. The Incentive Plan was offered to all bankers employed in the PFG and was administered by Kolman and Wallace. *Id.* ¶¶ 79, 81.

Nagelson accepted the offer and began work on July 1, 2011. *Id.* ¶ 39.

Under the terms of his offer, Nagelson would serve as the supervisory principal for the San Francisco office. *Id.* ¶ 90. Over 2011 and 2012, Nagelson expanded the office. He hired two coverage bankers, *id.* ¶ 92, as well as one junior banker. *Id.* ¶ 94.

C.  Hiring of Plaintiff

The operations of the MSG and the PFG expanded from 2010 to 2012.  By 2012, the PFG operated out of four offices, each with its own supervisory principal: San Francisco, headed by Nagelson; New York headed by Kolman; Charlotte, headed by Wallace; and Chicago, headed by Brian McGough.  *Id*.

At the time of its creation in 2010, the MSG had several employees in New York.  Dkt. No. 77-6 at 14.  The New York office made new hires in 2011 and 2012.  *Id*. at 14-15.

In the fall of 2011, Boatright approached Kolman to discuss the possibility of obtaining a position at U.S. Bank.  Dkt. No. 86 ¶ 53.  Boatright is an African American female.  *Id*. ¶ 2.  She did not have a Series 53 license, which would have qualified her to serve in a position as supervisory principal.  *Id*. ¶ 59.  But she had previously been employed at several investment banks or financial institutions.  From 1992 to 1998, she had worked for Kolman as a banker in the Municipal Bond Department at Goldman Sachs.  *Id*. ¶¶ 40, 41.  In 1998, Boatright left the Municipal Bond Department and joined the Debt Capital Markets Division.  *Id*. ¶ 42.  In 2004, she resigned from Goldman Sachs, *id*. ¶ 43, and from 2005 to 2010, she held several positions at different investment banks.  *Id*. ¶ 44.

In April 2010, six years after she left Goldman Sachs, Boatright joined The BondFactor Company, LLC ("BondFactor"), a start-up business focused on selling insurance to the municipal bond market.  *Id*. ¶¶ 45, 46.  Boatright was initially employed not as a banker, but as Chief Marketing Officer and later as its Chief Operating Officer.  *Id*. ¶ 45.  Her base salary was nominally $600,000, but she was only eligible to receive that amount if BondFactor obtained a $10 million initial capital infusion from outside investors.  *Id*. ¶¶ 47-48.  BondFactor never obtained the capital infusion.  *Id*. ¶ 49.  Thus, Boatright was paid the equivalent of minimum

wage while she worked at BondFactor.  *Id.*  Plaintiff performed no bond underwriting or investment banking work while employed at BondFactor.  *Id.* ¶ 52.

Over the months following her approach in the fall of 2011, Boatright had several meetings with Kolman and Wallace to discuss potential employment with U.S. Bank.  *Id.* ¶ 55.  At that time, Kolman and Wallace were considering other candidates for a position in the New York office, which would focus on government and infrastructure clients based in the Northeast.  *Id.* ¶ 57.  The responsibilities for the position would include managing client relationships in the Northeast, generating new business for the PFG and executing transactions.  *Id.* ¶ 61.  The bank was not seeking a supervisory principal for the New York office and the role would not include supervisory responsibilities.  *Id.* ¶¶ 60-61.

Kolman and Wallace had some reservations about hiring Boatright.  *Id.* ¶ 62.  Kolman was concerned about her interpersonal skills, having heard from individuals at Morgan Stanley that she was "incredibly difficult to work with."  Dkt. No. 77-7 at 98.  Kolman told Wallace that Boatright could be "tough on support."  Dkt. No. 77-6 at 28.  Additionally, they were concerned that she might have some difficulty adjusting from the larger scale of "big bulge bracket investment banking firms" to "the reality of a startup municipal securities business at a conservative commercial bank."  Dkt. No. 77-6 at 32.  On the other hand, Kolman had "always had a lot of respect for" Boatright, having found her to be "intelligent" and a hard worker when they worked together at Goldman Sachs.  Dkt. No. 77-7 at 98.  Wallace also supported hiring Boatright, considering her to be "a smart, aggressive banker."  Dkt. No. 77-6 at 35-36.

During the interview process, Kolman and Wallace advised Boatright that the Northeast was not in U.S. Bank's traditional footprint, that U.S. Bank did not have a strong public finance presence there, and that part of Boatright's job would be to build that presence.  Dkt. No. 86 ¶

64. The two also advised her that the PFG was a start-up group and did not have a platform that was as large or well-established as its competitors. *Id.* Further, she would not have the same level of resources from junior bankers as she might have had when she worked at Goldman Sachs and other large investment banks. *Id.* Plaintiff confirmed that she wanted the position in spite of these challenges. *Id.* ¶ 65.

In early 2012, U.S. Bank hired Boatright as a Managing Director in the New York office. *Id.* ¶ 1. Like Nagelson, Boatright was eligible for incentive compensation payments under the Incentive Plan. *Id.* ¶ 75. Unlike Nagelson, Boatright did not receive a sign-on or guaranteed bonus. *Id.* ¶ 72. She began employment with U.S. Bank on February 13, 2012. *Id.* ¶ 78.

D.  Early Experience of Plaintiff

Boatright had difficulties managing junior employees from the beginning of her employment with U.S. Bank. When she began, Boatright was assisted by Elizabeth Conte ("Conte"), a junior banker based in New York. *Id.* ¶ 91. Though she regularly assisted Boatright, Conte did not directly report to her and also worked with other bankers. *Id.* By 2013, U.S. Bank had transferred Conte to a different department because, according to Kolman, Conte complained she was mistreated by Boatright. *Id.* ¶ 113; Dkt. No. 28; Dkt. No. 77-7 at 48, 172.[1]

At Plaintiff's request, the PFG also hired Jose Yandun ("Yandun") as a junior banker in the New York office. Dkt. No. 86 ¶ 95. Yandun supported Boatright almost exclusively, but he resigned in August 2014. *Id.* ¶ 97. Until he resigned, Boatright had a difficult relationship with

---

[1] In her response to Defendants' 56.1 Statement, Boatright challenges this and numerous other factual assertions as inadmissible hearsay, because Defendants rely on deposition testimony of Wallace and Kolman reporting what other U.S. Bank employees contemporaneously said to them. But Defendants are relying on this testimony not for the truth of the matter asserted (i.e., whether in fact Boatright mistreated Conte and other employees) but for the fact that other junior employees complained to Boatright's superiors that Boatright had mistreated them. The complaints—not whether they were well-founded or not—have independent evidentiary significance. *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.") (quoting Fed. R. Evid. 8010(c) advisory committee's note).

Yandun.  On at least one occasion, Boatright copied Yandun's co-workers on emails criticizing his work product.  *Id*. ¶ 111.  On a number of occasions, Yandun told Kolman that Boatright had verbally attacked him and treated him unfairly.  *Id*. ¶ 112.  In his exit interview, Yandun stated that Boatright was difficult to work with, that she was "very critical, confrontational," and that she "can be demanding, put you down."  Dkt. No. 77-59 at 4.  Yandun also stated that his relationship with Boatright was one of the reasons he chose to resign.  Dkt. No. 86 ¶ 121.  The other reasons he offered were frustration with his compensation and the fact that, in his view, U.S. Bank's strategy was not winning business.  Dkt. No. 77-59 at 2.  After Yandun resigned, Kolman told Boatright that he had resigned because of her mistreatment of him.  Dkt. No. 86 ¶ 114.

In September 2014, following Yandun's resignation, Plaintiff interviewed Jon Mesadieu ("Mesadieu") for a position in the New York office.  *Id*. ¶ 122.  At the time, Boatright, Kolman, and Wallace all recognized that Mesadieu was inexperienced.  Dkt. No. 86 ¶ 123.  When it was decided that Mesadieu would be hired, Boatright requested that he report directly to her.  Dkt. No. 77-60 at 2.  The request was denied, and Mesadieu reported to Wallace, but worked primarily for Boatright, though he also supported other bankers.  Dkt. No. 86 ¶¶ 123, 124.  Boatright quickly grew dissatisfied with Mesadieu's performance.  *Id*. ¶ 125.  As she had with Yandun, Boatright began to copy Mesadieu's co-workers and supervisors on emails she sent to him criticizing his performance.  *Id*. ¶¶ 125-26.

During this time, Boatright also received occasional support from other junior bankers.  *Id*. ¶¶ 127-28.  She refused to work with at least one junior analyst, whom she believed was not suited for his position.  *Id*. ¶ 130.  She frequently complained that she was not receiving adequate support in the form of assistance from junior bankers.  Dkt. No. 77-39.

Boatright's interpersonal challenges were not limited to her interactions with junior bankers.  In 2014, Boatright also had conflicts with bankers in U.S. Bank's Government Banking Group ("GBG"), on whom PFG bankers relied upon for business referrals.  Dkt. No. 86 ¶ 131.  In 2014, three members of the GBG complained to U.S. Bank's HR Department about Plaintiff's rudeness, her refusal to include them in correspondence and meetings with clients, and her failure to collaborate on business prospects.  *Id*. ¶ 132.  At least one such conflict triggered an inquiry by U.S. Bank's Human Resources Department.  *Id*. ¶ 134.  This inquiry did not result in any formal discipline, but Boatright was advised that she should try to work more productively with her colleagues in the GBG.  *Id.*; Dkt. No. 77-3 at 16.

### E.  PFG Restructuring and Boatright's Continuing Performance Issues

In March 2014, Wallace and Kolman began to plan a restructuring of the PFG.  Dkt. No. 86 ¶ 165.  The restructuring was intended to consolidate the PFG's sector-specific business groups and create a dedicated pool of resources for PFG bankers.  *Id*. ¶ 166.  Wallace and Kolman selected Nagelson to lead the new consolidated group.  Dkt. No. 77-48.  The restructuring was completed by April 2015.  Dkt. No. 86 ¶ 167.  Boatright became part of a newly configured public finance team dedicated to government and infrastructure clients and reporting to Nagelson.  *Id*. ¶ 167.  Boatright's job title, job grade, job duties, base salary and eligibility for incentive compensation were unchanged by the restructuring.  *Id*. ¶ 169.

Beginning in 2014, U.S. Bank started to provide formal performance reviews to bankers in the PFG.  *Id*. ¶ 160.  In November 2014, Wallace began drafting Boatright's performance review.  *Id*. ¶¶ 159-60.  Wallace asked Maureen McGovern ("McGovern"), an HR Representative, to help draft the performance review to address Boatright's interpersonal performance issues.  *Id*. ¶ 161; Dkt. No. 77-92; Dkt. No. 77-93.

The performance review Wallace prepared awarded Boatright an overall performance rating of 3, indicating "Solid Performance."  Dkt. No. 77-94.  The review rated employees on a scale of 1-5, with 1 representing the top of the scale or "Exceptional," and a 5 representing the bottom or "Not Effective."  Dkt. No. 84-59.  In the "Build Relationships" and "Collaborate" categories, Boatright received a rating of 4 out of 5, towards the bottom of the scale, indicating "Needs Improvement."  *Id*.  The review indicated that Boatright "has had some challenges developing consistent, positive relationships with some of her colleagues in MSG and in Government Banking."  *Id*. at 5.  It also stated that: "Among some of the things we have discussed are better planning, time management and higher quality communication (less email and more dialogue with colleagues and partners)."  *Id*. at 6.

The performance review also raised issues about Boatright's revenue production.  The review stated that her 2014 revenue production "on a Gross Basis was ranked 8th out of our 14 coverage bankers and on a Net Basis (Gross minus Direct Purchase income) 11th out of 14."  Dkt. No. 77-94 at 3.  The review also observed that "Faye has successfully won assignments on finance teams for larger, high profile issuers, but at times these clients don't match-up well with our current distribution system (especially retail)."  *Id*.  It went on to note that "[m]ore balance and diversification is needed in the business strategy to generate greater revenue potential from the Northeast market."  *Id*. at 3-4.  Further, "Faye's partnership and relationship behavior during 2014 was inconsistent within MSG and with Government Banking.  More consistency here should also result in stronger revenue growth."  *Id*. at 4.

Wallace provided Boatright with the 2014 Review on February 27, 2015.  Dkt. No. 86 ¶ 162.

By April 2015, the restructuring of the PFG was completed and Nagelson took over

leadership of the new national team.  *Id*. ¶ 168.  On April 29, 2015, Nagelson announced at a company meeting that the new team would be named the "National Infrastructure Group."  *Id*. ¶ 170.  In an email sent the same day, Boatright requested that Nagelson consider choosing a different name, because of the way the name abbreviated ("NIG").  *Id*. ¶ 172; Dkt. No. 77-100. Within twenty-four hours, Nagelson changed the name to the "Government Infrastructure Group" (the "GIG").  Dkt. No. 86 ¶ 173.

Shortly after taking leadership of the GIG, Nagelson began to express concerns about Boatright's performance.  In an email dated May 15, 2015, Nagelson stated Boatright's behavior and performance needed to be addressed citing: "(1) Her pattern of developing "adversarial relationships with junior staff. . . . (2) Her history of conflict with business partners, such as GBD Relationship Managers, . . . (3) The practice of documenting other individuals' short-comings in emails that are distributed to many people. (4) Multiple instances of violating the company's requirements around pre-clearance of securities trades. (5) Unacceptably low revenue generation."  Dkt. No. 77-102 at 2.

In consultation with Kolman, Wallace, and McGovern, Nagelson drafted a document outlining goals and expectations for Plaintiff (the "G&E Outline).  *Id*. ¶ 185.  The purpose of the G&E Outline was to help Boatright with her performance and for Wallace and Nagelson to "track [her performance] and see progress over time."  Dkt. No. 77-4 at 124; Dkt. No. 86 ¶ 185. The G&E Outline stated that Plaintiff needed to:

- Adapt client coverage practices and business efforts around [U.S. Bank's] platform strengths to drive positive revenue events and measurable results.
- Mentor junior colleagues in a positive and constructive way by exhibiting patience and support to enrich the colleague's knowledge and experience.
- Provide constructive and solutions-oriented feedback instead of making negative comments about Relationship Manager experience, municipal sales performance, quantitative and execution support, and credit approvals.

- Build and re-build collaborative, mutually beneficial relationships with colleagues in MSG and Government Banking.
- Avoid using email to highlight junior colleagues' mistakes to senior management; instead, directly share feedback with colleagues in a positive and/or constructive way.
- Be professional and courteous at all times[.]
- Compl[y] with all company policies[.]

Dkt. No. 86 ¶ 186.  The G&E Outline included revenue generation goals for Plaintiff of $1 million in capital markets fees and $500,000 in direct purchase fees.  *Id*. ¶ 187.  The same targets were given to all senior GIG bankers.  *Id*.  The G&E Outline also stated that, should Plaintiff fail to meet the expectations outlined, she could face lower performance ratings, reduced incentive compensation, and disciplinary action.  *Id*. ¶ 188.

On July 17, 2015, Nagelson provided Plaintiff with an updated G&E Outline as part of her mid-year review.  *Id*. ¶ 189.  The updated G&E Outline criticized Plaintiff for: (1) continuing to "use email to point out short-comings in [] Mesadieu's knowledge or performance"; (2) openly discussing the shortcomings of junior staff with members of the GBG; (3) being disrespectful to her GBG peers and refusing to communicate with some of them directly; (4) failing to comply with multiple U.S. Bank policies."  *Id*. ¶ 190.  The updated G&E also observed that "[a]necdotally, several colleagues have commented on Faye's lack of response to emails and conference call/meeting invitations."  Dkt. No. 77-107 at 4.  It also indicated that Boatright had sent "multiple emails referencing lack of resources as a reason that a variety of things have not happened" and had continued to "provide[] unnecessary details about short-comings of junior staff."  *Id*. at 4.  The updated G&E Outline also included some positive feedback, crediting her for being "positive and patient" and for sending emails "that were constructive in tone and expressed appreciation for efforts."  Dkt. No. 86 ¶ 190.

During 2015, Boatright repeatedly declined opportunities for work, citing a lack of

resources and Mesadieu's incompetence. *Id.* ¶¶ 196-98. She declined or failed to pursue several revenue generating opportunities with small or mid-cap issuers, claiming that she lacked the resources to pursue the opportunities. *Id.* ¶ 195. On October 27, 2015, a GBG banker referred prospective business to Boatright, but she declined to work on the project, again citing lack of resources. Dkt. No. 77-112 at 4. Nagelson asked her to investigate the opportunity and indicated that he would provide resources to support quality opportunities, but she again refused, claiming that Nagelson had a "record of not assigning additional resources to support coverage of Northeast accounts." *Id.* at 3.

Boatright also continued to complain about having to work with Mesadieu, whom she characterized as a "junior underperforming resource." Dkt. No. 86 ¶ 196. She did not refrain from castigating Mesadieu for minor mistakes in emails copied to his peers and superiors, despite the continued admonitions of her superiors not to do so. *Id.* ¶¶ 203-05. In one incident, Boatright sent an emailed complaint to Kolman and Wallace after Mesadieu had made a mistake. *Id.* ¶ 205. Kolman responded: "Faye I am sorry that you have little to no patience with mistakes for what we ALL agree is an inexperienced professional trying hard to move up the learning curve. . . . [B]eating people into submission does not help and is also not your responsibility to behave that way. Your constant e-mails torturing people or complaining about people is also not acceptable behavior." *Id.*

Furthermore, Boatright continued to have interpersonal conflicts with members of the GBG, who complained about her to Wallace on several occasions. *Id.* ¶¶ 201-02. In one incident, a GBG banker complained that Boatright lied to her by telling her that she was unable to schedule a meeting with a business prospect. Shortly thereafter, the banker reported that she had noticed Boatright and the business prospect having lunch together. *Id.* ¶ 202. Boatright also

refused to work on deals with the Long Island Power Authority and the Metropolitan Transportation Authority because of her conflicts with GBG bankers.  *Id*. ¶ 198.

Plaintiff also violated several U.S. Bank policies.  Pursuant to U.S. Bank's Personal Investment Policy ("PIP"), MSG members were required to pre-clear personal securities trades by requesting advance approval from U.S. Bank.  *Id*. ¶ 115.  This policy was intended to avoid insider trading concerns.  *Id*.  Boatright had been counseled by U.S. Bank's Compliance Department about the PIP following a violation of the policy in 2013.  *Id*. ¶ 116.  In 2015, she failed to pre-clear personal securities trades in violation of the PIP three times.  *Id*. ¶ 214.

She violated U.S. Bank's corporate credit card policy by using the company card to make personal purchases.  *Id*. ¶ 215.

She also violated U.S. Bank's Independent Registered Municipal Advisor Policy.  *Id*. ¶¶ 216-17.  Under this policy, only independent registered municipal advisors ("IRMAs") are permitted to provide certain kinds of information or advice to bond issuers.  *Id*. ¶ 216.  Because U.S. Bank was not an IRMA, bankers were prohibited from providing such advice until the banker confirmed to U.S. Bank's Compliance Department that the client already had an IRMA.  *Id*.

In October 2015, Nagelson provided Plaintiff with another revised G&E Outline, which indicated that she had failed to demonstrate improvement in the areas identified in the previous G&E Outline.  *Id*. ¶ 192.  The October G&E Outline indicated that Boatright had generated only $113,326 in capital markets fees by September 30, despite a target of $1,000,000.  Dkt. No. 77-109 at 2.  Her capital markets fee generation was the lowest of any banker in the GIG.  Dkt. No. 86 ¶ 192.  Boatright's revenue generation in 2015 was the lowest of her career at U.S. Bank.  *Id*. ¶ 199.  The Outline also noted that Boatright maintained that she could not set up more than one

meeting with possible clients at a time due to lack of support.  Dkt. No. 77-109 at 3.

Additionally, Boatright had failed to respond to emails and to perform work requested by her

superiors.  *Id*. at 3-4.  According to the October G&E Outline, Boatright had "made no visible

effort to investigate or identify prospects and clients that are suitable for the USB platform" and

she had "conducted only 19 client visits/idea memos since early May, which is the lower [sic]

than any other GIG senior banker."  *Id*. at 4.  The Outline also faulted her for continuing to

complain about Mesadieu through emails copying his superiors and co-workers, and for failing

to educate and mentor Mesadieu.  *Id*. at 5, 7.

### F.  Boatright's Discrimination Claims

In December 2014, Boatright approached Richard Payne, a Vice Chairman at U.S. Bank,

at a holiday party, and told him that she believed she was being discriminated against based on

her gender and her race.  Dkt. No. 86 ¶ 138.  She complained that she had far fewer resources

than Nagelson and that she was being paid less than Nagelson.  Dkt. No. 77-2 at 313.  Payne

relayed her complaint to the HR Department, where McGovern commenced an investigation.

Dkt. No. 86 ¶ 139.

On December 19, 2014, McGovern contacted Boatright to discuss her claims.  *Id*. ¶ 140.

A few days later, on December 23, 2014, McGovern conducted two telephone interviews with

Boatright.  Boatright claimed that she was: (1) denied sufficient resources; (2) excluded from

client communications and new business prospects by members of the GBG; (3) not invited to

casual lunches when Wallace came to the New York office; and (4) not sufficiently supported by

Wallace in her business efforts.  *Id*. ¶ 141.  Boatright claimed that these issues were related to her

race and gender.  *Id*.  She did not complain about unequal pay.  *Id*. ¶ 142.

On January 5, 2015, Boatright informed McGovern that she was preparing a written

summary of the complaints she had raised.  *Id.* ¶ 153.  McGovern attempted to schedule follow

up interviews with Boatright, but was unable to do so because Boatright was traveling for

business or otherwise busy.  *Id.*  By January 21, 2015, Boatright still had not provided McGovern

with her written summary and McGovern advised Boatright that she could not proceed in the

investigation without further information and that she was, at that time, unable to substantiate the

claims of discrimination.  *Id.* ¶ 154.  On February 5, 2015, Boatright sent her written summary to

McGovern.  *Id.* ¶ 155.  Her summary principally complained that Wallace failed to provide her

with adequate resources.  Dkt. No. 77-79.  This lack of support, Boatright stated, "has been

manifested through a lack of resources to cover my clients relative to both external competition

and internal comparable groups, lack of support in providing credit facilities to Northeast Region

issuers and a failure to respond to performance issues brought to [Wallace's] attention."  *Id.* at 4.

Boatright additionally claimed that Wallace was "unsupportive of my development and success

at US Bancorp," and that he had "supported exclusionary and unprofessional actions of others as

well as promulgated exclusionary behavior."  *Id.*  McGovern and Boatright discussed the

document by phone shortly thereafter.  Dkt. No. 86 ¶ 155.

McGovern subsequently interviewed Kolman, Wallace, and Joe Murphy, U.S. Bank's

Head of Public and Nonprofit Finance, about the Boatright's letter.  *Id.* ¶ 143; Dkt. No. 77-84.

Wallace reported that he regularly spoke with Boatright to talk about her deals and had been

encouraging her to "focus on more middle market credits vs large clients, ones that fit our model

better.  In the NE there are a lot of large, sophisticated issuers, that we can't make a lot of money

on."  Dkt. No. 77-84 at 2.  He noted that he had "encouraged Faye to move away from those

types of clients, [and had] tried to help her development on our platform."  *Id.*  Kolman and

Wallace both reported that they had encouraged Boatright to reach out and talk to people rather

than sending emails and that Boatright generally did not come out of her office and kept her door closed. *Id.* at 7. Wallace stated that his casual lunch invitations were extended to everyone in the New York office, but that Boatright probably did not hear his invitations because she kept the door to her office closed. *Id.* Wallace committed to working with Boatright and to spending more time with her when he was in New York. *Id.* at 2.

McGovern concluded that Plaintiff's discrimination claims were unsubstantiated and advised her that the investigation was closed. Dkt. No. 86 ¶ 159.

On August 26, 2015, U.S. Bank received a demand letter from Plaintiff's counsel. *Id.* ¶ 191. The letter included complaints about her compensation based on her gender and race. *Id.*

Around the same time, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), premised on the same allegations she made in the demand letter. *Id.* ¶ 193. U.S. Bank received the charge in late November or early December. *Id.*

G.  Boatright's Termination

On November 12, 2015, Boatright was working on a response to a Request for Proposal ("RFP") for the Metropolitan Washington Airports Authority (the "MWAA"). *Id.* ¶ 220. An RFP is a document issued to multiple banks by clients seeking financial services. *Id.* ¶ 219. A bank that responds to an RFP is generally trying to put its best foot forward so it will be selected for a project. *Id.* The RFP language drafted by Boatright incorrectly suggested that Boatright had been demoted and her job title and compensation reduced. Dkt. Nos. 77-142, 77-143. It also contained gratuitous language about the number of employees that reported to Boatright and Nagelson respectively, and suggested that Boatright might be leaving the Bank. It stated:

> Within MSG, Ms. Boatright was formerly Head of Northeast Banking, although she had no direct reports serving this region. In April 2015, the Northeast Group

> was folded into the Public Infrastructure Group, Headed [sic] by Scott Nagelson, Managing Director located in San Francisco, CA, formerly Head of West Coast who has had six direct reports since 2012.  To the extent Ms. Boatright is further demoted or no longer with US Bancorp, Michael Placencia will assume leadership of US Bancorp's banking team for the Authority.

*Id*. ¶ 220.  Another U.S. Bank employee noticed the language and alerted Nagelson, who observed that it was "inappropriate" and instructed that it be removed.  *Id*. ¶ 221; Dkt. No. 77-141.

Shortly thereafter, Nagelson, Kolman, Wallace and McGovern began to discuss terminating Boatright's employment.  Dkt. No. 86 ¶ 225.  The decision was made over a series of calls among the four.  Dkt. No. 77-4 at 282.  All four supported termination.  Dkt. No. 77-3 at 219; Dkt. No. 77-4 at 282; Dkt. No. 77-6 at 131; Dkt. No. 77-7 at 271.  Nagelson viewed Boatright's insertion of the language about herself into the RFP as an indication that "she was more interested in sabotaging our efforts than supporting them."  Dkt. No. 77-4 at 282.  McGovern thought the decision was "appropriate" given "all of the performance issues, and behavioral issues, and policy violations, and work-related issues that they had been addressing with her that hadn't improved."  Dkt. No. 77-3 at 220.  Wallace thought the primary issue was "performance as measured by revenue production," along with "the weight of the other issues such as the failure to adapt to our business model, the failure to generate strong, positive working relationships with her partners, the treatment of some of her colleagues [and] policy violations."  Dkt. No. 77-6 at 131.  Nagelson made the final decision to terminate Boatright.  Dkt. No. 77-3 at 219.  The decision was finalized in mid-December.  Dkt. No. 86 ¶ 226.  Out of deference to her, the four agreed to wait to inform Boatright of her termination until after the holiday season.  *Id*. On January 12, 2016, Nagelson, Wallace, and Kolman met with Plaintiff and informed her that her employment with U.S. Bank was terminated, effective immediately.  *Id*. ¶ 227.

U.S. Bank issued a Form U-5, as required when a financial institution terminates an associated person's employment, upon Plaintiff's termination.  *Id.* ¶ 228.  The Form U-5 stated that the reason for Plaintiff's termination was "Terminated by bank affiliate for unsatisfactory job performance.  Not investment related."  *Id.*

On May 18, 2018, the EEOC issued a finding of probable cause.  Dkt. No. 84-5. Boatright filed this lawsuit shortly thereafter.  Dkt. No. 1.

H.  Boatright and Nagelson's Revenue Histories

Throughout her employment with U.S. Bank, Boatright received less compensation than Nagelson.  In 2012, she received an incentive compensation award of $179,000.  Dkt. No. 86 ¶ 104.  For that same year, Nagelson received his contractually guaranteed incentive compensation award of $450,000.  *Id.* ¶ 105.  In 2013, Boatright received an incentive compensation award of $170,000.  *Id.* ¶ 117.  For that same year, Nagelson received an incentive compensation award of $325,000.  *Id.*  For 2014, Boatright received an incentive compensation award of $135,000.  *Id.* ¶ 137.  For that same year, Nagelson's incentive compensation award was $295,000.  *Id.* ¶ 137.  In every year of her employment with U.S. Bank, Boatright's base salary was equal to or higher than every other male and/or white Director or Managing Director in the PFG with the exceptions of Nagelson and Brian McGough, the supervisory principal for the Chicago office. *Id.* ¶ 71.

The two also generated dramatically different amounts of revenue for U.S. Bank. In 2012, Boatright generated $747,123 in total revenue, which placed her in the lower range for Managing Directors in the PFG.  *Id.* ¶ 101, 102. In 2013, Boatright generated $826,571.40 in revenue, including $316,098.66 of higher quality capital markets fees.  *Id.* ¶ 106.  In 2014, Boatright generated $1,236,925 in total revenue, but only $442,499.75 in capital markets fees.

*Id*. ¶ 118.  In 2012, Nagelson generated $2,518,341 in revenue.  *Id*. ¶ 102.  In 2013, Nagelson

generated $1,850,721.68 in total revenue, including $843,445.64 in capital markets fees.  *Id*. ¶

108.  In 2014, Nagelson generated $778,668 in total revenue, almost all of which consisted of

capital markets fees.  *Id*. ¶ 119.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008),

and the movant bears the burden of demonstrating that "no genuine issue of material fact exists."

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation."

*F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).  Rather, to survive a summary

judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. Of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

In cases involving claims of discrimination or retaliation, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Chiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockerfeller & Co., Inc.*, 258 F.3d 62, 69 (2d. Cir. 2001)) (internal citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137.

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how

the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c).

## DISCUSSION

### A.  Equal Pay Act

The EPA "prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for equal work." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999).  The Act states, in relevant part:

> No employer having employees subject to any provisions of this section shall discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

29 U.S.C. § 206(d)(1).

Claims under the EPA are evaluated under a burden shifting framework.  In order to make out a prima facie case under the EPA, a plaintiff must show that: (1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions.  *See Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001) (quoting *Belfi*, 191 F.3d at 135).  "[P]roof of the employer's discriminatory intent is not necessary for the plaintiff to prevail on her claim."  *Belfi*, 191 F.3d at 136 (citing *Pollis v. New Sch. for Soc. Rsch.*, 132 F.3d 115, 118 (2d Cir. 1997)); *see also Littlejohn v. City of N.Y.*, 795 F.3d 297, 309 n.7 (2d Cir. 2015) (noting that under the EPA, "liability turns on whether lesser pay is given for equivalent work—discriminatory motivation is not an element of the claim").

If a plaintiff can make the prima facie showing required under the EPA, the burden of persuasion shifts to the employer to demonstrate that the wage disparity is justified by one of four affirmative defenses provided under the EPA: (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex.  29 U.S.C. § 206(d)(1); *see also*, *Belfi*, 191 F.3d at 136; *Borrero v. Am. Exp. Bank Ltd.*, 533 F. Supp. 2d 429, 439 (S.D.N.Y. 2008).  "Once the employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, 'the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination.'"  *Ryduchowski v. Port Auth. of N.Y. & N.J.*, 203 F.3d 135, 142 (2d Cir. 2000) (quoting *Belfi*, 191 F.3d at 136). "The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has used the factor reasonably in light of the employer's stated purpose as well as its other practices."  *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 526-27 & n.1 (2d Cir.

23

1992).

Claims under the EPA are subject to a two-year statute of limitations, except in the case of a willful violation, which is subject to a three-year limitations period. 29 U.S.C. § 255(a). The filing of an EEOC charge does not toll the limitations period. *See Suzuki v. State Univ. of N.Y. Coll. at Old Westbury*, 2013 WL 2898135, at *5 (E.D.N.Y. June 13, 2013). Because Plaintiff did not file her Complaint until August 13, 2018, even if willful violations of the EPA were to be found, any claims that arose prior to August 13, 2015 are time-barred. Plaintiff was terminated on January 12, 2016, and so her EPA claim can only cover the period from August 13, 2015 to January 12, 2016 (the "EPA Relevant Period").

Plaintiff has failed to make out the prima facie case required under the EPA. The comparator she identifies for her position is Nagelson.[2] But at all times during the EPA Relevant Period, the undisputed evidence establishes that Plaintiff did not perform "equal work on jobs requiring equal skill, effort, and responsibility," as Nagelson's job and hers was not "performed

---

[2] In her brief in opposition to summary judgment, Boatright argues, for the first time in this litigation, that other U.S. Bank employees should be considered her comparators for EPA and Title VII purposes. Boatright points to Brian McGough, supervisory principal of the Chicago office, who was paid more than her both in base salary and in incentive compensation, and to Mahajan, Allison, Verch, Stowe, and Afsharipour—all non-African American men—who received larger bonuses in 2015 than Boatright, though their base salaries were lower. Boatright named Nagelson only as a comparator when asked at her deposition and did not once suggest that there were other comparators prior to her response to the summary judgment motion. Having previously disavowed that there was another relevant comparator and having failed to raise this argument in her complaint, in her deposition, or at any other time prior to her response to summary judgment, it is too late for Boatright to raise this argument now. *See Minnifield v. City of Birmingham*, 2015 WL 5675738, at *7 (N.D. Ala. Sept. 28, 2015) (holding that a plaintiff in a pay discrimination case cannot "switch horses mid race and use [a different employee] as [a] comparator . . . [because a] plaintiff may not change or create new claims in his response to a summary judgment motion.") (quoting *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008)); *see also Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (declining to reach the merits of an argument raised for the first time in opposition to summary judgment). In any event, the argument is meritless. For reasons stated in the reply brief, the difference in pay with the other alleged comparators is justified by factors other than sex.

under similar working conditions."  Nagelson was Boatright's superior.  As part of the PFG

Restructuring, which was completed by April 2015, prior to the beginning of the EPA Relevant

Period, Nagelson became the chief of the GIG, the group in which Boatright was employed.  *See*

*Garcia v. Barclay's Cap., Inc.*, 281 F. Supp. 3d 365, 387 (S.D.N.Y. 2017) ("It is self-evident that

a manager does not hold substantially the same position as the individuals she manages.

Moreover, it is undisputed that being the head of a regional team is a more senior position and

commands a higher level of responsibility than being a member of a regional team."); *Casseus v.*

*N.Y. Coll. of Health Pros.*, 2016 WL 7029157, at *18 (E.D.N.Y. Nov. 10, 2016) (holding that an

adjunct professor was not similarly situated to her supervisors).

Furthermore, Nagelson had many responsibilities dissimilar to those of Boatright and

requiring greater skill, effort and responsibility.  He served as the leader and supervisory

principal of the San Francisco office and supervised all employees of the GIG.  He was in charge

of monitoring the performance of all employees and evaluating them.  Additionally, he was

charged with developing and implementing the GIG's revenue generation strategies.  *See*

*Chiaramonte v. Animal Med. Ctr.*, 2016 WL 299026, at *10 (S.D.N.Y. Jan. 22, 2016) (holding

that, in order to make a prima facie case under the EPA, a plaintiff must "establish that the jobs

compared entail common duties or content").

Boatright, by contrast, did not have any of these responsibilities during the EPA Relevant

Period.  Her primary job duty at all times during which she was employed was to generate

revenue.  Dkt. No. 86 ¶ 61.  At no time did Boatright have a supervisory role or a role in

developing strategy.  *See* 29 C.F.R. § 1620.17 ("The equal pay standard applies to jobs the

performance of which requires equal responsibility. . . . Responsibility is concerned with the

degree of accountability required in the performance of the job, with emphasis on the importance

of the job obligation.").  Because Boatright has not shown that her position was substantially similar to Nagelson's during the EPA Relevant Period, she has failed to make out a prima facie case for liability under the EPA.  *See Drury v. Waterfront Media, Inc.*, 2007 WL 737486, at *3 (S.D.N.Y. Mar. 8, 2007) ("Courts have repeatedly made clear that the 'substantially equal' requirement is designed to ensure that employers do not incur liability for legitimate wage disparities owing to differences.").

Boatright suggests that, to the extent that Nagelson's position was different from and superior to hers, the difference in treatment between the two was itself a function of discrimination.  U.S. Bank did not sponsor her to take the Series 53 exam, as it did for some other employees.  Had it done so, she suggests, she would have passed and could have supervised others.  That argument, however, does not help Boatright's EPA claim.  For purposes of the EPA, the court and the factfinder analyze whether the plaintiff was treated differently from (and worse than) a similarly situated employee.  If Plaintiff cannot identify at least one similarly-situated employee who was paid differently (and better), she does not have an EPA claim.  It does not matter for EPA how it came to be that there were no similarly situated employees.  *See Kassman v. KPGM LLP*, 925 F. Supp. 2d 453, 471 (S.D.N.Y. 2013) ("[T]he EPA does not afford a remedy for denial of promotions or 'titles'.").

Finally, even if Nagelson were an appropriate comparator for Boatright, there is no genuine issue of fact that the wage disparity was justified by non-pretextual factors other than sex.  An EPA claim must be dismissed where an employer can justify a wage differential on factors such as salary negotiated at hire, "inducement to hire the best person for the job," an employee's earnings at a prior employer, and the holding of relevant licenses.  *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 570-71 (S.D.N.Y. 2012); *Virgona v. Tufenkian Import-Export*

*Ventures, Inc.*, 2008 WL 4356219, at *10 (S.D.N.Y. Sept. 23, 2008); *Drury*, 2007 WL 737486, at *4; *Milligan v. Citibank N.A.*, 2001 WL 1135943, at *9 (S.D.N.Y. Sept. 26, 2001).  U.S. Bank has offered an undisputed explanation for Nagelson's salary and why it was greater than Plaintiff's.  Nagelson had to be recruited away from another high-paying position, whereas Plaintiff was coming from a job where she was paid a minimum wage.  Nagelson was hired to build an office from the ground up and to serve as the supervisory principal of the San Francisco office, and held the Series 53 license required to do so.  Plaintiff was not hired as a supervisory principal and was not qualified to serve in that capacity.  Nagelson had previous experience building public finance businesses at major banks.  Plaintiff did not.  During the EPA Relevant Period, he held a more senior position than Boatright.  These factors all demonstrate that the salary differential between Nagelson and Boatright was based on permissible factors under the EPA.

Boatright has not put forth any evidence suggesting pretext.  She has offered nothing more than speculation that Nagelson was paid a higher salary because of his gender.  *See Virgona*, 2008 WL 4356219, at *11 ("A wage discrimination plaintiff, like any other, may not rest on conclusory allegations of discrimination to defeat an employer's legitimate explanation for its conduct.  Rather, the plaintiff must offer specific facts to create an issue of fact as to whether the employer's proffered justifications are true or false.") (quoting *Engelmann v. Nat'l Broad. Co., Inc.*, 1996 WL 76107, at *11 (S.D.N.Y. Feb. 22, 1996)).  Indeed, the undisputed record shows that Boatright was paid more in base compensation than any Managing Director in the PFG who did not serve as a supervisory principal.  Dkt. No. 86 ¶ 71.  Although she received less in incentive compensation, the record reflects that such incentive payments were based upon revenue generation and overall job performance and did not reflect a pay disparity based on

gender.

Summary judgment in favor of the defendants on an EPA claim "is appropriate where 'two positions are so different . . . that no reasonable juror could conclude that they are 'substantially equal.''" *Garcia*, 281 F. Supp. 3d at 386 (quoting *Drury*, 2007 WL 737486, at *3). Plaintiff has not put forth evidence from which a reasonable juror could conclude that Nagelson's and her positions were substantially equal during the EPA Relevant Period or that Defendants' substantial reasons for the pay differential were pretextual. Thus, Boatright has failed to make out a prima facie case of discrimination under the EPA and even if she had, Defendants have rebutted it. Defendants are entitled to summary judgment on Plaintiff's EPA claim.

### B.  Title VII Pay Discrimination Claim

Pay discrimination claims under Title VII are governed by the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff bears the initial burden of making out a prima facie case. To make out a prima facie case, a plaintiff is required to show that: (1) she was a member of a protected class; (2) she was qualified for the job in question; (3) she was paid less than those who were not members of her protected class for the same work; and (4) the employer's adverse employment decision occurred under circumstances that raise an inference of discrimination. *See Belfi*, 191 F.3d at 140. In discrimination cases, the burden of establishing a prima facie case is "minimal." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also*, *Scaria v. Rubin*, 117 F.3d 652, 654 (2d Cir. 1997) ("The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal."). However, a plaintiff cannot establish a prima facie case based on "purely conclusory allegations of discrimination, absent any concrete

28

particulars." *Meiri v. Dacon*, 859 F.2d 989, 998 (2d Cir. 1985).

If a plaintiff can meet the initial burden of showing a prima facie case, "the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the [adverse employment action]. If the defendant does so, the burden returns to the plaintiff to show that the real reason for [the adverse employment action] was" her membership in a protected class. *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).

The parties do not dispute that Plaintiff has satisfied the first element of the prima facie case; it is undisputed that, as an African American woman, she is a member of two protected classes.

The parties do, however, contest whether Boatright has made out the other three elements of the prima facie case. As for the second element, there is no dispute that Boatright had the qualifications necessary to be hired for her position. She had years of experience in banking and in public finance and Kolman stated at his deposition that: "[h]er intelligence, her smarts was [sic] never questioned on my part." Dkt. No. 77-7 at 70. However, the Second Circuit has held that this element may be analyzed in terms of whether the plaintiff has shown "satisfactory job performance." *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir. 1997). In such cases, "[w]hether job performance was satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge." *Id.* The record shows that Plaintiff did suffer from performance deficiencies, including: (1) low revenue generation, particularly with respect to higher-value capital markets fees; (2) refusal to adjust her business strategy; (3) mistreatment of junior employees; (4) inability to work cooperatively with members of the GBG; (5) violation of the PIP, IRMA, and credit card policies; and (6) the inclusion of embarrassing and inappropriate language in the response to the

29

WMAA's RFP.  Defendant contends that, in light of the evidence of these performance deficiencies, Plaintiff cannot make out a prima facie case of discrimination.

Defendant's argument raises the question what Plaintiff is required to show in order to demonstrate satisfactory job performance in her prima facie case, and the extent to which Defendant is permitted to rebut that showing before the burden has shifted its way.  The Second Circuit addressed this issue in *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).  There, the court stated that, in using the language of satisfactory job performance in the context of the second element of the prima facie case, it had not "raised the standard set by the Supreme Court for what suffices to show qualification." *Id*. at 91.  Instead, "[t]he qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate non-discriminatory basis for its decision." *Id*. at 92.  The inquiry must wait until the burden has shifted to the defendant.  The qualification and job performance showing required is "minimal; plaintiff must show only that [s]he 'possesses the basic skill necessary for performance of [the] job.'" *Id*. (quoting *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)).

As in *Slattery*, Defendants here seek to have the Court impose a "heightened requirement" upon Plaintiff.  248 F.3d at 92.  Plaintiff is not obligated at the outset to rebut Defendants' complaints about her job performance; instead, she must merely show that she was qualified for her job.  Plaintiff has met that burden here.

The third element of the prima facie case of Title VII pay discrimination requires the plaintiff to show that she was underpaid discriminatorily.  She may make this showing, as in the EPA context, by pointing to an alleged comparator who earned more money for the same work. *Lenzi*, 944 F.3d at 109; *see also Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)

30

("A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case."). She is not confined to that method of proof, however. In *Lenzi v. Systemax, Inc.*, the Second Circuit clarified that a plaintiff in a Title VII pay discrimination case need not show, as she must in the EPA context, that "she performed equal work for unequal pay," so long as she can show by some alternative means that she was "discriminatorily underpaid." 944 F.3d 97, 110 (2d Cir. 2019) (quoting *Washington Cnty. v. Gunther*, 452 U.S. 161, 178 (1981)). Thus, unlike in the EPA context, a plaintiff need not identify a comparator employee who was paid more than her in order to make out the prima facie case. She may satisfy the third element by providing evidence "that the challenged wage rate is not based on seniority, merit, quantity or quality of production, or any other factor other than sex." *Id.* at 111 (quoting *Gunther*, 452 U.S. at 168). If she can provide such evidence, she is not required to show the existence of an exact comparator who was paid at a higher rate. *Id.* at 110 ("[A] Title VII plaintiff alleging a discriminatory compensation practice need not establish that she performed equal work for unequal pay."). In *Lenzi*, for instance, the Second Circuit permitted a plaintiff to proceed when she showed that she was paid at a rate below the prevailing market salary for her position, while men in different positions at her employer were paid at an above-market rate. *Id.* at 111.

While relying on *Lenzi* for the proposition that the third prong of the prima facie case presents a low hurdle, Plaintiff bases her argument that she has satisfied the third prong principally on the traditional method of proving pay discrimination. She points to Nagelson as an "exact comparator who, from the moment he was hired, was paid far more than her." Dkt. No. 91 at 18.

As discussed above, Nagelson is clearly not an appropriate comparator for Boatright during the EPA Relevant Period, which follows the PFG Restructuring; Nagelson was Plaintiff's superior during that time period and had far greater responsibilities.  However, Title VII has a lengthier limitations period than the EPA, and so the Court must consider whether earlier in their employment with U.S. Bank Nagelson and Boatright were sufficiently appropriate comparators to make out the showing necessary for a prima facie case under Title VII.  A plaintiff seeking to pursue claims pursuant to Title VII "must file administrative charges with the EEOC within 300 days of the alleged discriminatory acts."  *Flaherty v. Metromail Corp.*, 235 F.3d 133, 136 n.1 (2d Cir. 2000).  The statute of limitations begins to run when each discriminatory act occurs.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Boatright filed her charge with the EEOC on October 19, 2015.  Thus, her Title VII claims extend to the period beginning December 23, 2014.

Keeping in mind Plaintiff's minimal burden in making out the prima facie case, and recognizing that the issue is close, the Court concludes that, viewed in the light most favorable to Plaintiff, the evidence could support a finding that Nagelson was a sufficient comparator for Boatright during the period before he took leadership of the GIG.  Several pieces of evidence support this conclusion: (1) Boatright and Nagelson both held the title "Managing Director"; (2) Boatright and Nagelson both held the internal grade of 18 within U.S. Bank's internal hierarchy; (3) on October 27, 2011, while considering offering Boatright the position for which she was ultimately hired, Wallace sent an email to Kolman and other U.S. Bank executives, stating: "We have scheduled time on your calendar . . . for you to meet Faye Boatright.  We are talking to Faye as our lead infrastructure banker in the Eastern Region (much like Scott Nagelson in the Western Region)," Dkt. No. 86 ¶ 148; (4) on U.S. Bank's internal organizational chart labelled

"Municipal Bond 2013: Public Finance", Boatright and Nagelson occupied the same position in their respective offices, Dkt. No. 28; (5) Boatright and Nagelson had the same job description when they were hired.  A reasonable juror could conclude, in consideration of this evidence, that Nagelson and Boatright held the same position prior to Nagelson's promotion.

There is, no doubt, substantial contrary evidence to suggest that Nagelson and Plaintiff were not comparators.  This evidence includes that fact that Nagelson had many job responsibilities that Boatright did not, even prior to taking leadership of the GIG, including: (1) opening and leading the San Francisco office; (2) serving as the supervisory principal of the San Francisco office; and (3) making personnel decisions for the San Francisco office.  There is additionally record evidence showing that Nagelson's higher salary was a function of an arms'-length bargaining process to recruit him away from a lucrative position at another bank and that his higher bonuses were the result of a record of revenue generation and performance that was superior to Boatright's.  At the prima facie stage, however, Defendant cannot rebut Plaintiff's case.  Plaintiff has put forth enough evidence at this early stage to meet her minimal burden of showing that a reasonable juror might conclude that she and Nagelson held comparable positions prior to the time when Nagelson assumed leadership of the GIG.  Because the facts could support a finding that Nagelson was Boatright's comparator during the period prior to the completion of the PFG Restructuring, and because he was paid substantially more than Boatright at all relevant times, Plaintiff has satisfied the third element of the prima facie case.

Finally, in order to make out the prima facie case, Boatright must show that the facts give rise to an inference of discriminatory animus.  An inference of discrimination can be proven with direct or indirect evidence.  *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).  Such evidence may take a "variety" of forms, including "the employer's criticism of the plaintiff's

performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Espinoza v. N.Y.C. Dep't of Transp.*, 304 F. Supp. 3d 374, 389 (S.D.N.Y. 2018) (quoting *Littlejohn*, 795 F.3d at 312 (2d Cir. 2015)).  "[T]he fact that an employer favored someone outside of the relevant protected class will ordinarily suffice to sustain an inference of discrimination." *Vill. Of Freeport v. Barrella*, 814 F.3d 594, 601 n.9 (2d Cir. 2016).

Plaintiff has not offered evidence from which a reasonable juror could find an inference of discrimination.  In order to establish an inference of discrimination, Plaintiff relies principally upon the disparity in payment and resources between herself and Nagelson.  Plaintiff alleges, and Defendant disputes, that U.S. Bank deliberately deprived her of the resources that would be necessary for her to succeed and did so because of her race and gender, assigning her underperforming junior bankers, while giving Nagelson a "team" on the West Coast.  Dkt. No. 86 ¶ 88.  Plaintiff also puts forward three alleged statements by Kolman to suggest an inference of discrimination.  She claims that he: (1) once referred to Washington, D.C. as having "bad . . . neighborhoods" and being "unseemly"; (2) once said that the former Chairman of Goldman Sachs "grew up in a really bad neighborhood" and; (3) once said that "the Obamas are disgusting."  Plaintiff points to Nagelson's original name choice for the public finance team—the "National Infrastructure Group"—as evidence of discrimination.  Finally, Plaintiff points out that other employees committed the same policy violations that were part of the reason U.S. Bank stated it terminated her, and were not fired.

Plaintiff's allegations do not clear the threshold for satisfying the fourth element of the prima facie case.  First, Kolman's alleged remarks and Nagelson's initial naming of the National

Infrastructure Group are not themselves sufficient to give rise to an inference of discrimination. Kolman's alleged remarks are race and gender neutral.  An employer or supervisor can comment that an urban area has bad neighborhoods or compliment a bank Chairman for having achieved success despite having come from a less privileged background without—by such comments—taking on the burden to justify (even through a burden of production) an adverse employment action for an employee.  So too an employer or supervisor may make derogatory, but race and gender neutral, comments about a political figure including a President of the United States without giving rise to an inference of discrimination.  That is so when the comments are directed at a President who happens to be black or African-American no less than if the comments were directed at a White male or a woman.  *See, e.g., Milord-Francois v. N.Y. State Off. of Medicaid Inspector Gen.*, 2020 WL 5659438, at *14 (S.D.N.Y. Sept. 23, 2020) (holding that no inference of discrimination arose where plaintiff's superior made facially race-neutral comments about Harlem and plaintiff's "angry face" outside the context of the adverse employment action suffered by plaintiff).

The same holds for Nagelson's original titling of the National Infrastructure Group, which the undisputed evidence shows was the name of several other groups in the industry, Dkt. Nos. 77-97, 77-98, 77-99, and which he promptly changed after Boatright complained.  Dkt. No. 86 ¶ 173.

Even if Kolman and Nagelson's remarks were interpreted as discriminatory, the Second Circuit has held that "stray remarks," on their own, are not sufficient to raise an inference of discrimination.  *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination."); *see also Liburd v. Bronx Lebanon Hosp. Ctr.*, 2009 WL

900739, at *4 (S.D.N.Y. Apr. 3, 2009) ("The remark must be considered in context—the more

remote and oblique the remarks are in relation to the employer's adverse action, the less they

prove that the action was motivated by discrimination, while the more a remark evinces a

discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory

behavior, the more probative that remark will be.").  In determining whether a remark is stray, a

court considers four factors:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).  The factors are to be considered

in their totality.  *See Sergilus v. Convenant House Under 21,* 1999 WL 717274, at *6 (S.D.N.Y.

Sept. 15, 1999) ("Stray remarks are not evidence of discrimination if they are not temporally

linked to an adverse employment action or if they are made by individuals without decision-

making authority.") (citation omitted).

Nagelson's initial naming of the GIG is impossible to link to Plaintiff's pay

discrimination allegations.  Although Nagelson was her direct superior at the time he selected the

offending name, Plaintiff's allegation is that she was underpaid during the full duration of her

employment at U.S. Bank.  It is undisputed that Nagelson had no involvement with decisions

about Plaintiff's pay prior to the point when he assumed leadership of the GIG.  It is further

undisputed that Nagelson never cut Plaintiff's pay during the period when he led the GIG.  Thus,

an inference of discrimination cannot arise from Nagelson's remark.

Kolman, on the other hand, did have a role in setting Plaintiff's salary, thus satisfying the

first element of the stray remarks test.  However, his remarks, too, are insufficient to raise an

inference of discrimination on their own.  Boatright raises no allegation that these remarks were made in relation to Boatright's employment or decisions about her pay specifically; nor do these facially race-neutral remarks contain any content of a discriminatory nature or that reflects gender or race-based animus.  As such, these remarks are also properly classified as "stray" and cannot, on their own, give rise to an inference of discrimination.

The analysis then comes down to whether Plaintiff can make out a prima facie case by adding to the foregoing comments the fact that she received less compensation than Nagelson and he received superior resources.  *See Khanna v. MUFG Union Bank, N.A.*, 785 Fed. App'x 15, 16 (2d Cir. 2019) (holding that a complaint could survive a motion to dismiss on allegations that the plaintiff "was provided fewer resources, given fewer responsibilities, and held to a higher standard than her white male coworkers.").  On the undisputed facts here, Plaintiff cannot establish a prima facie case.  Nagelson had employees reporting to him because he had a Series 53 license and was capable of supervising employees.  Boatright did not have junior bankers reporting to her because she was not a supervisor and was not qualified to be a supervisor.  She was not hired to be a supervisor.  In that respect, she was treated no differently than bankers in any of the other satellite offices outside of U.S. Bank's traditional footprint of the West Coast, each of whom was able to draw upon—as Boatright was able to draw upon—the unassigned cadre of junior bankers.  No one of these senior bankers had junior bankers reporting to them. Boatright was paid more in base salary than all Managing Directors in the PFG who—like Plaintiff—did not serve as supervisory principals and she was entitled to participate like them in the incentive plan that was applied uniformly to all Managing Directors.  *See Fincher v. Depository Tr. and Clearing Corp.*, 2008 WL 4308126, at *4 (S.D.N.Y. Sept. 17, 2008) (finding no inference of discrimination where plaintiff could not rebut the evidence that her employer

applied its performance policy uniformly); *Lee v. Healthfirst, Inc.*, 2007 WL 634445, at \*12-14 (S.D.N.Y. Mar. 1, 2007) (granting summary judgment where defendant granted and denied salary increases and bonuses consistent with policy guidelines).  In the face of that evidence, Defendants were not required to give Plaintiff, uniquely among non-supervisory Managing Directors, junior bankers to report to her alone lest—if Defendants did not do so—they create an inference of discrimination and take on for themselves the burden of production under the *McDonnell Douglas* framework.

Finally, even if Boatright could make out the prima facie case, the undisputed record shows that there were legitimate nondiscriminatory reasons that U.S. Bank might pay Nagelson substantially more than it paid Boatright.  Under *McDonnell Douglas*, Defendant's burden of putting forth legitimate, nondiscriminatory justification for the adverse employment action is one of "production, not persuasion."  *Reeves*, 530 U.S. at 142 (2000).  "[T]he court is not to pass judgment on the soundness or credibility of the reasons offered by defendants, so long as the reasons given are 'clear and specific' and, therefore, sufficient to raise a genuine issue of material fact as to whether defendants discriminated against the plaintiff."  *Joseph v. Marco Polo Network, Inc.*, 2010 WL 4513298, at \*13 (S.D.N.Y. Nov. 10, 2010) (quoting *Mandell*, 316 F.3d at 381 (2d Cir. 2003)).

Defendants' legitimate nondiscriminatory reasons include the facts that: (1) Nagelson had prior experience building and leading public finance groups; (2) Nagelson had prior experience working in commercial banks which Plaintiff did not; (3) Nagelson had more total years of work experience in the financial services industry than Boatright; (4) Nagelson held a Series 53 license and was hired to serve a supervisory principal; (5) Nagelson was hired with managerial responsibilities that Boatright never had; (6) Nagelson was earning a comparable salary at

Jeffries and had to be aggressively recruited in order to attract him away from his position there; (7) Nagelson generated more revenue than Plaintiff in every year except for 2014, and generated more high-quality capital markets fees in every year; (8) Nagelson did not have any of the interpersonal issues that Plaintiff did; and (9) Nagelson was charged with supervising an office in U.S. Bank's traditional footprint, while Boatright worked in an office where U.S. Bank was attempting to gain a foothold for the first time. Each of these is a legitimate, nondiscriminatory reason for a pay differential. *See Byrnie v. Town of Cromwell*, 243 F.3d 93, 103-05 (2d Cir. 2001) (holding that superior job qualifications are a legitimate, nondiscriminatory reason); *Wagh v. Wilkie*, 2020 WL 5732035, at *16 (S.D.N.Y. Sept. 24, 2020) (holding that a difference in credentials constitutes a legitimate, nondiscriminatory reason); *Moll v. Telesector Res. Grp., Inc.*, 2020 WL 5593845, at *25 (W.D.N.Y. Sept. 18, 2020) ("[I]nducements to recruit" an alleged comparator constituted a legitimate, nondiscriminatory business reason."); *Pompey-Howard v. N.Y. State Educ. Dep't*, 275 F. Supp. 3d 356, 364 (N.D.N.Y. 2017) (holding that more extensive experience is a legitimate, nondiscriminatory reason).

Boatright has not produced evidence from which a reasonable juror could conclude that these reasons U.S. Bank gave for paying her less were pretextual. In making a determination on pretext "the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom.'" *Reeves*, 530 U.S. at 143 (2000) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 n.10 (1981)). If the plaintiff "has presented evidence sufficient to support an inference . . . that the reasons given by the defendant for its employment decision were not its real reasons, triable issues of fact are presented." *Stern v. Trs. of Columbia Univ. in N.Y.*, 131 F.3d 305, 313 (2d Cir. 1997). "At the summary judgment stage, an employee may meet his or her burden of demonstrating pretext 'by providing evidence that

would allow a fact finder reasonably to (1) disbelieve the employer's articulated legitimate

reasons; or (2) believe that an invidious discriminatory reason was more likely than not the

motivating or determinative cause of the employer's action.'" *Walfish v. Nw. Mut. Life Ins. Co.*,

2019 WL 1248342, at *9 (S.D.N.Y. Mar. 29, 2019) (quoting *Rich v. Verizon N.J. Inc.*, 2017 WL

6314110, at *18 (D.N.J. Dec. 11, 2017)).

Boatright's two principal pieces of evidence for finding the discrepancy between her pay

and Nagelson's to be based on discrimination are: (1) Nagelson's prior experience did not justify

his pay; and (2) she attended Stanford University for her undergraduate studies and held an MBA

from Wharton Business School, while Nagelson did not hold an MBA and received his BA from

Miami University.  Neither of these arguments are sufficient to show pretext.

Boatright's quibbles with Nagelson's prior experience do not render U.S. Bank's reasons

pretextual.  The record contains ample evidence from which U.S. Bank could conclude that

Nagelson's prior experience justified higher pay.  Those reasons include that U.S. Bank's

management considered it necessary to recruit him away from his high-paying position at

Jeffries, that Nagelson had the legal capacity to act as a supervisor which Plaintiff did not, that

he was hired into a supervisory role, and that he had prior experience opening offices for prior

employers, which Plaintiff did not.  *See DeJesus v. Starr Tech. Risks Agency, Inc.*, 2004 WL

2181403, at *10 (S.D.N.Y. Sept. 27, 2004) (holding that plaintiff's "personal belief that he is as

qualified as the other employees who were paid more is not enough to create an issue of fact

when the other employees admittedly had more relevant work . . . experience that plaintiff

lacked."); *Gross v. Nat'l Broad. Co., Inc.*, 232 F. Supp. 2d 58, 72 (S.D.N.Y. 2002) (holding that

plaintiff's "conclusory statement and subjective feelings . . . in support of [plaintiff's] claims that

she was treated differently because of her gender . . . cannot withstand a properly supported

motion for summary judgment.").

As for her and Nagelson's education, the differences again do not render U.S. Bank's reasons for the pay difference to be pretextual.  There were numerous differences in the job experience and work responsibilities of Nagelson and Plaintiff.  The fact that years earlier she may have gone to Stanford while he went to Miami, assuming there is a meaningful difference in reputation between the schools as applied to municipal banking, does not necessarily mean that the decision to pay the more experienced Miami graduate more than the less-experienced Stanford graduate is discriminatory.  There is no reason to infer from the fact that U.S. Bank paid Boatright, a Stanford graduate, less than Nagelson, a graduate of Miami University, that Defendants were engaging in discrimination.

Because Boatright has presented no evidence of pretext to overcome the legitimate, nondiscriminatory reasons for her pay relative to Nagelson's that U.S. Bank has put forth, summary judgment is granted to U.S. Bank on Boatright's Title VII pay discrimination claim.

### C.  Title VII, NYSHRL & NYCHRL Retaliation

Retaliation claims under Title VII are also analyzed under the *McDonnell Douglas* burden shifting framework.  *Smith v. New York City*, 385 F. Supp. 3d 323, 345 (S.D.N.Y. 2019).  In order to establish a prima facie case of Title VII retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Hicks*, 593 F.3d at 164 (2d Cir. 2010) (citing *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  As in the discrimination context, "[t]he plaintiff's burden of proof as to this first step 'has been characterized as 'minimal' and '*de minimis*.'"  *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (quoting *Jute*, 420 F.3d

at 173).  "In determining whether this initial burden is satisfied in a Title VII retaliation claim,

the court's role in evaluating a summary judgment request is to determine only whether proffered

admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory

motive."  *Jute*, 420 F.3d at 173.  The elements of a prima facie case of retaliation under Title VII,

the NYSHRL, and the NYCHRL are "identical," except that the NYCHRL employs a broader

standard of an "adverse employment action" than its federal and state counterparts."  *Smith*, 385

F. Supp. at 345-46 (citing *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 70 (S.D.N.Y.

2016)).

It is undisputed that Boatright engaged in protected activity when she filed her

discrimination complaint with the EEOC on October 19, 2015.  Nor is it disputed that U.S. Bank

became aware of this activity by early December 2015.  Finally, the parties agree that Kolman,

Wallace, Nagelson, and McGovern agreed to terminate Boatright shortly after U.S. Bank

received the EEOC charge.[3]  Thus, only the fourth prong of the prima facie case is in dispute.

Title VII retaliation claims require that a plaintiff "establish that his or her protected

activity was a but-for cause of the alleged adverse action by the employer," and not merely a

"substantial" or "motivating" factor, which is sufficient for a discrimination claim.  *Univ. of Tex.*

*Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362, 348 (2013).  At the prima facie stage, a plaintiff may

show causation either indirectly, "by showing that the protected activity was closely followed in

---

[3] Boatright does not allege that any adverse employment action arose out of her December 2014 complaint at the holiday party.  Nor could she.  The only employment event subsequent to her complaint was her placement on the performance improvement plan reflected in the G&E Outline, but it is well established that being placed on a performance improvement plan does not constitute an adverse employment action.  *Brown v. Am. Golf Corp.*, 99 Fed. App'x 341, 343 (2d Cir. 2004) (finding an employee's placement on an employment improvement plan insufficient to constitute an adverse employment action); *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 524 (S.D.N.Y. 2015) (same).  Thus, Boatright cannot allege retaliation based on her 2014 complaint.

time by the adverse [employment] action," *Kwan v. Andelex Grp., LLC*, 737 F.3d at 845 (quoting

*Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir.

2001)), or directly, "through evidence of retaliatory animus directed against the plaintiff by the

defendant." *Hicks*, 593 F.3d at 170 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117

(2d Cir. 2000)).

The decision to terminate Boatright occurred in mid-December, within weeks of U.S.

Bank's receipt of the EEOC charge.  This span of time is sufficiently narrow to support an

inference of a retaliatory motive.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d

Cir. 2010) (holding that a three-week span between a complaint and discharge was close enough

in proximity to raise an inference of retaliation).  However, it is not sufficient alone to raise an

inference of such a motive to satisfy the plaintiff's prima facie burden.  Where "the only basis for

showing causation at the prima facie stage is a temporal nexus, 'and gradual adverse job actions

began well before the plaintiff had ever engaged in any protected activity, an inference of

retaliation does not arise.'"  *Giudice v. Red Robin Intern., Inc.*, 555 Fed. App'x 67, 69 (2d Cir.

2014) (quoting *Slattery*, 248 F.3d at 95); *see also Spadola v. N.Y.C. Transit Auth.*, 242 F. Supp.

2d 284, 294-95 (S.D.N.Y. 2003) (holding that an employer is "not obligated to automatically

cease or abandon an ongoing internal disciplinary procedure merely because an employee files a

charge alleging discrimination").  Were this not the case, "[a]n employee who has been

repeatedly reprimanded and who sees the writing on the wall '[could] shield herself from

legitimate managerial prerogatives by threatening a discrimination complaint and then alleging

unlawful retaliation.'"  *Vitale v. Equinox Holdings, Inc.*, 2019 WL 2024504, at *13 (S.D.N.Y.

May 7, 2019) (quoting *Lee v. Healthfirst, Inc.*, 2007 WL 634445, at *24 (S.D.N.Y. Mar. 1,

2007)).

That proposition is squarely applicable here.  The undisputed record reflects that by the time U.S. Bank received Boatright's EEOC charge, Boatright was suffering from numerous performance issues which had been noted by her employer, including generating the least revenue of any senior banker in the GIG for 2015, repeated interpersonal conflicts with her colleagues and subordinates, and multiple policy violations.  There is no evidence that these complaints themselves were discriminatory.  They came from numerous different employees at the Bank.  Moreover, prior to the EEOC charge, U.S. Bank had repeatedly warned Boatright and attempted to help her with her performance issues by: (1) counseling her on her policy violations and interpersonal issues with coworkers; (2) providing her with lower incentive compensation payments in 2013 and 2014 because of her performance deficiencies; (3) critiquing her performance on her 2014 Review; and (4) providing her with G&E Outlines in May, July, and October 2015.  Those efforts did not succeed.  Even after the counseling, Plaintiff continued to have performance issues culminating in the disciplinary violations and the incorrect and derogatory comments in the RFP.  The termination of her employment, following her failure to respond to the criticisms that predated the EEOC charge, does not suggest retaliation.

Plaintiff attempts to counter by asserting that Defendants "only discussed terminating [her] after U.S. Bank's receipt of her EEOC charge."  Dkt. No. 86 ¶¶ 225-26.  The evidence contradicts this claim.  Nagelson testified that the decision to terminate Boatright was made in November 2015, in response to her insertion of the language suggesting she had been demoted into the RFP, before U.S. Bank received the EEOC charge.  Dkt. No. 77-4 at 282.  U.S. Bank was under no obligation to stop considering terminating Boatright after receiving the charge.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("[Employers] proceeding along lines previously contemplated, though not definitively determined, is no evidence whatever of

causality" in Title VII retaliation claims); *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 385-86

(S.D.N.Y. 2013) (dismissing NYSHRL and NYCHRL claims where employer had already begun

contemplating plaintiff's termination before receiving notice of the complaint).  Indeed, there is

no any evidence that Kolman, Nagelson, Wallace, or McGovern, the decisionmakers in

Boatright's termination, even knew about the EEOC charge when they decided to terminate

Boatright.  Because Plaintiff has presented no evidence other than the timing of U.S. Bank's

receipt of her EEOC charge to prove that she was fired in retaliation for it, Plaintiff cannot make

out a prima facie case of retaliation.

Even if Plaintiff could make out the prima facie case here, she has failed to show any

evidence that Defendants' proffered reasons for terminating her were pretextual.  In order to

establish pretext "a plaintiff must produce evidence sufficient to cast doubt that the defendants'

proffered reasons are not the real reasons for the adverse employment action." *Blanco v.

Brogan*, 620 F. Supp. 2d 546, 554 (S.D.N.Y. 2009) (citing *Jute*, 420 F.3d at 173).  The plaintiff

may satisfy her burden at this stage "by proving that an impermissible factor was a motivating

factor, without proving that the employer's proffered explanation was not some part of the

employer's motivation." *Fields v. N.Y. State Off. of Mental Retardation and Developmental

Disabilities*, 115 F.3d 116, 120-21 (2d Cir. 1997); *see also Cronin v. Aetna Life Ins. Co.*, 46 F.3d

196, 203 (2d Cir. 1995) ("[P]laintiff is not required to show that the employer's proffered

reasons were false or played no role in the employment decision, but only that they were not the

only reasons and that the prohibited factor was at least one of the motivating factors.").

Boatright's principal theory is that, beginning in December 2014, after her complaint of

discrimination at the holiday party, U.S. Bank began creating a paper trail of trumped-up

performance issues in order to create a basis for terminating her.  These issues included her

interpersonal difficulties, her low revenue generation, her violations of U.S. Bank's PIP, IRMA, and credit card policies, and, finally, her insubordinate insertion of the language suggesting she had been demoted into the RFP for the WMAA. This argument suffers from two critical flaws. First, Boatright's performance issues, particularly with respect to her interpersonal relationships, pre-dated her complaint at the December 2014 holiday party. By December 2014, Conte and Yandun had already requested transfers in order not to work with Boatright anymore. Wallace began drafting Boatright's 2014 review in November, before she made her initial complaint of discrimination. The review cited her consistent interpersonal problems as an area that needed improvement, stating that "Faye has had some challenges developing consistent, positive relationships with some of her colleagues in MSG and Government Banking" and that "[w]e have discussed having more patience with partners, particularly in difficult and challenging situations." Dkt. No. 77-94. The review also cited Boatright's use of email as a problem: "Among some of the things we have discussed are better planning, time management and higher quality communication (less email and more dialogue with colleagues and partners)." *Id.* The inference thus is plain that the post-December performance counseling was the result of Boatright's pre-December performance issues.

Second, the undisputed evidence is that the performance issues—both before and after December 2014—were real. Boatright concedes that she had a difficult relationship with Mesadieu and—though she argues she was justified by Mesadieu's poor performance—admits that she sent numerous emails to superiors complaining about his performance despite their repeated admonitions to stop. She concedes that she was the GIG's lowest revenue generator in 2015, though she argues this was only because she was starved of resources. She does not contest that she violated the IRMA, PIP, and credit card policies, suggesting only that other

employees did the same thing and faced lesser discipline.  She admits that she inserted the offending language into the RFP, but claims she did so merely in an effort to be "truthful."  Boatright thus concedes that none of the reasons given for her termination were false; she merely provides excuses for them, which cannot support a finding of pretext.  *See Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 3d 385, 395 (E.D.N.Y. 2008) (holding that pretext could not be established where plaintiff, "rather than disput[ing] that most of these complaint or incidents occurred, . . . merely provide[d] explanation for his failure to perform his job satisfactorily . . . or trie[d] to minimize the significance of the incident.").  *Ricks v. Conde Nast Publ'n, Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) ("[T]he mere fact that an employee disagrees with her employer's assessment [of her performance] cannot stand [] on its own [] to show that her employer's reason for termination was pretextual.").

Boatright additionally attempts to establish pretext by arguing that other U.S. Bank employees were not terminated for similar conduct.  She argues that for each of the rules she violated, there was another employee who also violated that rule without being terminated.  It is not sufficient that Plaintiff show that there is at least one person who violated each rule she violated without being terminated.  In order to show that different employees were disciplined differently, a plaintiff must show that "the conduct for which the employer imposed discipline was of comparable seriousness."  *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).

Boatright has failed to do so.  Boatright violated multiple policies despite repeated warnings over a period spanning years.  She violated the PIP policy three times in 2015 alone, along with violating the IRMA and credit card policies.  Although Boatright notes that Wallace violated the PIP policy on at least one occasion, and that Nagelson, Kolman, and Jon Welch, a junior banker in the GIG, all violated the credit card policy and were not terminated, though

Welch did receive a written reprimand, Dkt. No. 84-53, none of those employees had the record of repeated violation of numerous rules that Boatright had.  A bank—which has responsibility to its clients and to the public—has the discretion to take action against a non-compliant employee. Plaintiff has not shown that U.S. Bank's determination that such time had come in her case was pretextual.[4]

For these reasons, Boatright cannot make out a prima facie case of retaliation under Title VII, the NYSHRL, or the NYCHRL.  Even if she could, she has presented no evidence that her termination was pretextual.  Thus, U.S. Bank is entitled to summary judgment on Boatright's retaliation claim.

## CONCLUSION

For the foregoing reasons, summary judgment is GRANTED to Defendants on all counts. The Clerk of Court is respectfully directed to enter judgment for Defendants and close the case.


SO ORDERED.

Dated: December 16, 2020

_____

---

[4] Boatright also points out that Kolman's performance evaluations indicated that he needed to improve his personal relationships.  Kolman's 2014 evaluation reflected a rating of "Solid Performance" for "Build Relationships" and stated: "Strong relationships with customer and community but could be more effective with internal relationships across business lines."  Dkt. No. 84-60.  His 2015 performance evaluation reflected a rating of "Needs Improvement" in the "Build Relationships" category stating that Kolman could "improve the tone of his interactions internally" and that he "continue[d] to question internal policies that are often core elements of USB culture, which creates issues that chew up time and resources to fix."  Dkt. No. 84-61 at 6. However, Kolman's alleged interpersonal issues never reached anywhere near the severity of Boatright's.  During her brief time at U.S. Bank, multiple employees asked not to work with Boatright anyone longer and in some instances left the Bank at least in part because of her abrasive style.  The record also shows that she was repeatedly asked not to use email to embarrass her subordinates to their co-workers and superiors, but continued to do so in spite of these requests.  Finally, her supposed comparators did not suffer from the same performance deficiencies as Boatright, nor did they engage in direct insubordination, as she did with the RFP.

New York, New York                                  LEWIS J. LIMAN
United States District Judge